UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Jeff Heimerl and Fred Jahnke, as Trustees of the IBEW Local No. 292 Health Care Plan; Trustees of the Electrical Workers Local No. 292 Pension Fund; as Trustees of the Electrical Workers Local No. 292 Annuity & 401(k) Fund; as Trustees of the Electrical Workers Local No. 292 Vacation & Holiday Fund; and as Trustees of the Minneapolis Electrical Industry Board/JATC/LMCC; and each of their successors,<br><br>    Plaintiffs,<br><br>v.<br><br>Tech Electric of Minnesota, Inc.,<br><br>    Defendant. | Case No. 12-cv-612 (SRN/SER)<br><br>**MEMORANDUM OPINION AND ORDER** |

Amanda R. Cefalu and Rebecca A. Peterson, Anderson, Helgen, Davis & Nissen, PA, 333 South Seventh Street, Suite 310, Minneapolis, Minnesota 55402, for Plaintiffs.

Chad A. Kelsch, Fuller, Seaver, Swanson & Kelsch, P.A., 5500 Wayzata Boulevard, Suite 1025, Golden Valley, Minnesota 55416, for Defendant.

SUSAN RICHARD NELSON, United States District Judge

  This matter is before the Court on Defendant Tech Electric of Minnesota, Inc.'s Motion for Summary Judgment [Doc. No. 20] and the Motion for Partial Summary Judgment by Plaintiffs Jeff Heimerl and Fred Jahnke, trustees of numerous fringe benefit plans for the International Brotherhood of Electrical Workers Local No. 292 (the "Trustees.") [Doc. No. 25.] For the reasons set forth below, the Court denies the parties'

1

motions for summary judgment.

## I. BACKGROUND

The Trustees are fiduciaries for the International Brotherhood of Electrical Workers Local No. 292's (the "IBEW") Health Care Plan, Pension Fund, Annuity and 401(k) Fund, Vacation and Holiday Fund, and the Minneapolis Electrical Industry Board/JATC/LMCC (the "fringe benefit plans.") (Am. Compl. ¶¶ 1–5 [Doc. No. 18].) Employers who hire union labor agree to be bound by the Inside Collective Bargaining Agreement (the "Inside Agreement") and must make fringe benefit contributions. (Roe-Hardie Aff. ¶ 2, Ex. B [Doc. No. 28].) The fringe benefit plans are maintained pursuant to § 302(c)(5) and (c)(6) of the Labor Management Relations Act of 1947 ("LMRA"), as amended 29 U.S.C. § 186(c)(5) and (c)(6). (Am. Compl. ¶¶ 1–5 [Doc. No. 18].) The plan is administered in accordance with the provisions of the Employee Retirement Income Security Act of 1974, as amended 29 U.S.C. § 1001, et seq. ("ERISA"). (Id.) Defendant Tech Electric of Minnesota, Inc. is a Minnesota corporation engaged in the electrical industry. (Id. ¶ 7.)

On or about October 20, 2000, the IBEW and Defendant signed a Letter of Assent authorizing the Minneapolis Chapter of the National Electrical Contractors Association ("NECA") to be Defendant's collective bargaining representative for all matters related to the Inside Agreement between NECA and the IBEW. (Roe-Hardie Aff. ¶ 2, Exs. A–B [Doc. No. 28]; Schmidt Aff. ¶ 2, Exs. 1–2 [Doc. No. 24].) The Letter of Assent authorized NECA to negotiate with the IBEW on Defendant's behalf and recognized that the IBEW was the exclusive representative of its employees performing electrical construction work in all present and future job sites. (Id.) The Letter of Assent also provided that Defendant

2

agreed to be bound by the provisions of the Inside Agreement and "the provisions contained in said current and subsequent approved labor agreements." (Id.) Therefore, Defendant is an employer within the meaning of ERISA § 3(5), codified at 29 U.S.C. § 1002(5). (Am. Compl. ¶ 7 [Doc. No. 18].)

The Inside Agreement required Defendant to make monthly contributions to the fringe benefit plans for which the Plaintiffs served as trustees. (Roe-Hardie Aff. ¶ 3, Ex. B at Art. 6 [Doc. No. 28].) Fringe benefit contributions were required to be paid monthly for all employees covered by the Inside Agreement. (Id. at Art. 6.13.) Defendant was required to compute its monthly contribution obligations and pay it to the agent for the Plaintiffs on or before the fifteenth day of the month. (Id.) Defendant was also required to submit a fringe benefit fund report to Plaintiffs or Plaintiffs' agent. (Id.) The Inside Agreement contained an "evergreen" provision that provided that it "shall remain in effect until April 30, 2010, unless otherwise specifically provided herein." (Id. at Art 1.01.) Under the "evergreen" provision, the Inside Agreement was to "continue in effect from year to year thereafter from May 1 to April 30 of each year, unless changed or terminated in the way later provided herein." (Id.)

Section 1.02 of the Inside Agreement provides how the agreement may be changed or terminated. (Id. at § 1.02.) Section 1.02 of the Inside Agreement states:

(a) Either party or an Employer withdrawing representation from the Chapter or not represented by the Chapter, desiring to change or terminate this Agreement must provide written notification at least ninety (90) days prior to the expiration date of the Agreement or any anniversary date occurring thereafter.

(b) Whenever notice is given for changes, the nature of the changes

3

(c) The existing provisions of the Agreement, including this Article, shall remain in full force and effect until a conclusion is reached in the matter of proposed changes.

(d) In the event that either party, or an Employer withdrawing representation from the Chapter . . ., has given a timely notice of proposed changes and an Agreement has not been reached by the expiration date or by any subsequent anniversary date to renew, modify, or extend this Agreement . . . either party or such an Employer, may serve the other a ten (10) day written notice terminating this Agreement. The terms and conditions of this Agreement shall remain in full force and effect until the expiration of the ten (10) day period.

. . .

(g) Notice of a desire to terminate this Agreement shall be handled in the same manner as a proposed change.

(Id.)

On November 25, 2009, Defendant sent the IBEW a letter with the subject line "Operating under collective bargaining agreement." (Schmidt Aff. ¶ 3, Ex. 3 [Doc. No. 24].) Defendant copied the NECA on the letter, but the NECA disputes that it ever received the letter. (Id.; Cefalu Aff. ¶ 6 [Doc. No. 30]) (stating that Defendant "never sent the termination letter to NECA"). The letter discussed pending litigation between Defendant and the IBEW and stated that "[i]t is the intent of [Defendant] to immediately withdraw from any affiliation with [the IBEW]." (Id.) On December 21, 2009, the IBEW wrote a letter to the NECA and Defendant stating that it was a "formal grievance" against Defendant for violation of the Inside Agreement. (Id. ¶ 4, Ex. 4.) The letter stated:

The [IBEW] is grieving [Defendant]'s refusal to abide by the terms of the

> Agreement through the end of its current term as provided in Article 1. [Defendant] indicated its intent to prematurely repudiate the Agreement and was advised by the [IBEW] that the terms of the Agreement do not expire until April 30, 2010. Rather than honoring its Agreement through that date, however, [Defendant] refuses to comply with the wages, benefits, and working conditions required by the Agreement. [Defendant] continues to perform work covered by the applicable Agreement and therefore its actions constitute a continuing violation of the Agreement.

(Id.) The IBEW also requested that the Defendant be "ordered to comply with all terms and conditions of the Agreement through April 30, 2010 for all electrical work performed by the employer within the scope of the [IBEW]'s jurisdiction." (Id.)

On April 6, 2010, Plaintiffs' counsel sent an e-mail to Defense counsel seeming to recognize that Defendant had terminated relations with the IBEW. (Id. ¶ 5, Ex. 5.) Specifically, the e-mail stated, "I informed him that we would be more than willing to enter into some kind of joint payment agreement with him and [Defendant] to ensure that benefits owed on work performed through May 2010 (since you abrogated the CBA) are paid." (Id.) Additionally, on May 13, 2010, Plaintiffs' counsel sent another e-mail to defense counsel acknowledging that the inside agreement had been terminated stating that April 30, 2010 was "when the [IBEW] contract ended-because you terminated it I believe." (Id. ¶ 6, Ex. 6.)[1]

On August 5, 2010, Plaintiffs inquired through their attorneys whether Defendant had "re-signed with the [IBEW]." (Id. ¶ 7, Ex. 7.) Defense counsel responded on August 10, 2010 that Defendant had "not re-signed with the [IBEW]." (Id.) Defendant had no

---

[1] Plaintiffs' counsel contends that these e-mails were sent in her representative capacity for Plaintiffs and not as counsel for the NECA. (Pls.' Mem. in Supp. of Mot. for Summ. J. at 4–5 [Doc. No. 27].)

further conversations with the IBEW about its termination of the Letter of Assent and its obligations under the Inside Agreement until Plaintiffs initiated this action. (Id. ¶ 8.) During this time, the IBEW did not request any payroll reports, contributions, or an audit from Defendant. (Id.)

Plaintiffs filed a Complaint on March 8, 2012 seeking to audit Defendant's records for compliance with the terms of the Inside Agreement. (Compl. [Doc. No. 1].) Plaintiffs filed an Amended Complaint on July 17, 2012 after Defendant stipulated to allow Plaintiffs to include an expanded period for the audit. (Am. Compl. [Doc. No. 18].) Plaintiffs allege Defendant is obligated to pay certain fringe benefit contributions into the Plaintiffs' benefit funds pursuant to the Inside Agreement. (Id. ¶ 13–18.) Plaintiffs' Amended Complaint seeks to audit payroll, tax, and financial records for the period of January 1, 2009 to the present. (Id. ¶¶ 19–24.) Plaintiffs also request entry of an order of judgment in the amount of fringe benefit contributions and liquidated damages owed to the Plaintiffs from April 2010 to the present. (Id. at 6–7.) The parties filed cross motions for summary judgment on September 6, 2012 and September 7, 2012 seeking a determination as to whether Defendant properly terminated the Letter of Assent such that it was no longer bound to the Inside Agreement. (Def.'s Mot. for Summ. J. [Doc. No. 20]; Pls.' Mot. for Partial Summ. J. [Doc. No. 25].)[2]

---

2      Plaintiffs' Motion for Partial Summary Judgment requested an order from the Court requiring Defendant to provide Plaintiffs with its "payroll records, time cards, IRS 941, W-2s, W-3s, MUTAs, and bank account information" from January 1, 2009 to the present to allow Plaintiffs to conduct an audit. (Pls.' Mem. in Supp. of Mot. for Summ. J. at 7 [Doc. No. 27].) Defendant agreed to allow Plaintiffs to perform a payroll audit for January 1, 2009 to April 30, 2010—the date Defendant allegedly terminated the Letter of

## II.   DISCUSSION

### A.   Standard of Review

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party.  Enter. Bank v. Magna Bank of Missouri, 92 F.3d 743, 747 (8th Cir. 1996).  However, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy, and inexpensive

---

Assent.  (Def.'s Mem. in Supp. of Mot. for Summ. J. at 3 [Doc. No. 22].)  Defendant disputed, however, that it was required to produce these materials after this date.  (Id.)  At the hearing on the parties' cross motions for summary judgment, the Court clarified that any disputes over production of documents should be addressed with the Magistrate Judge.  The parties then participated in a settlement conference with the Magistrate Judge on December 10, 2012 where Defendant agreed "to provide, or cooperate with Plaintiffs in obtaining, payroll and financial information relating to [Defendant]'s business operations for the period of May 1, 2010 to the present."  (Order dated December 13, 2012 at 2 [Doc. No. 41].)  Accordingly, the Court determines that Plaintiffs' request for an order from this Court requiring Defendant to provide payroll and financial information from January 1, 2009 to the present is now moot.

Additionally, Plaintiffs' Motion asks the Court to enter an order "finding that liability has been determined" and for an order entering judgment "for any and all unpaid contributions for the period of January 1, 2009 through the date of the entry of this Order."  (Pls.' Mot. for Summ. J. [Doc. No. 25].)  Plaintiffs also request that the Court award the greater of prejudgment interest, plus 10% liquidated damages, or double interest and attorney's fees and costs.  (Id.)  The Court finds that such requests are premature because Plaintiffs have presented no evidence that Defendant is liable for unpaid contributions for covered work.  Therefore, in response to the parties' motions for summary judgment, the Court will limit its review to whether genuine issues of material fact exist about whether Defendant properly terminated the Letter of Assent and its obligations under the Inside Agreement.

determination of every action." Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (citations and quotations omitted).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Id. at 323; Enter. Bank, 92 F.3d at 747. A party opposing a properly supported motion for summary judgment may not rest on mere allegations or denials, but must set forth facts in the record showing that there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

### B. Whether Defendant Terminated the Letter of Assent Such That It Was Not Bound to the Inside Agreement

Both parties move for summary judgment for a determination by the Court as to whether Defendant properly terminated the Letter of Assent such that it was no longer bound to the Inside Agreement. (Def.'s Mot. for Summ. J. [Doc. No. 20]; Pls.' Mot. for Partial Summ. J. [Doc. No. 25].) Section 515 of ERISA provides that:

> Every employer who is obligated to make contributions to a multiemployer plan under the terms of . . . a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such . . . agreement.

29 U.S.C. § 1145. A civil action may be initiated by a fiduciary for or on behalf of a plan to enforce § 515 and collect damages including any unpaid contribution, interest, liquidated damages, and attorneys' fees. See ERISA § 502(a), (g)(2), codified at 29 U.S.C. § 1132(a), (g)(2).

The Eighth Circuit has noted that Section 515 of ERISA was intended to "simplify actions to collect delinquent contributions, avoid costly litigation, and enhance the actuarial

planning necessary to the administration of multiemployer pension plans." Cent. States, SE & SW Areas Pension Fund v. Indep. Fruit & Produce Co., 919 F.2d 1343, 1348 (8th Cir. 1990) ("Central States") (citation omitted). Section 515 places "pension fund[s] in a better position than that which [they] would otherwise occupy in relation to the collective bargaining agreement" by eliminating certain "contract defenses—for example, fraud in the inducement, oral side agreements or course of performance." Id. "'[S]ection 515 means that . . . suit [by a trustee] cannot be thwarted by defenses not apparent from the face of the Agreement.'" Id. at 1349 (quoting Bituminous Coal Operators' Ass'n v. Connors, 867 F.2d 625, 634 (D.C. Cir. 1989)). "[C]ourts recognize only two defenses to a collection action: that the pension contributions are themselves illegal or that the collective bargaining agreement is void." Id. (citation omitted).

The Eighth Circuit in Central States, analyzed whether an employer could raise a particular defense to a plaintiff's claim that the employer had failed to make contributions required under collective bargaining agreements. 919 F.2d at 1345. There, the employer cited a provision in the collective bargaining agreements exempting "casual employees" from requiring contributions. Id. The district court had concluded that the term "casual employees" was ambiguous in the collective bargaining agreements and essentially determined that the term "casual employee . . . meant whomever the employer so designated." Id. at 1347. The Eighth Circuit disagreed, concluding that the term was unambiguous because the dictionary definition of the term and trial testimony established that a casual employee was one who worked "on a sporadic or infrequent basis." Id. at 1350. The employer had assigned a definition different from that term's plain meaning

9

without telling the plaintiff in an attempt to avoid making payments under the collective bargaining agreements. Id. at 1353. The employer's actions were similar to "when parties orally agree to ignore the unambiguous terms of a written agreement" and thus could not be used as a defense under Section 515. Id.

The Eighth Circuit opinion in Central States does not discuss the availability of the type of defense that the employer attempts to assert here. The Eighth Circuit concluded that an employer's defenses under § 515 are limited and do not include the ability to argue that the plain meaning of unambiguous language under the collective bargaining agreement was modified by the practice of the parties. See Central States, 919 F.2d at 1353. Here, by contrast, the employer argues that its actions and the IBEW's response evidence that there had been a termination of the agreement. (Def.'s Suppl. Mem. in Supp. of Mot. for Summ. J. at 1–2 [Doc. No. 37].) This does not require examination of an allegedly ambiguous term in the collective bargaining agreement, but rather requires the Court to determine whether the actions of the parties here amounted to an effective termination of the agreement.

The facts of this case are more analogous to the Sixth Circuit's opinion in Laborers Pension Trust Fund-Detroit & Vicinity v. Interior Exterior Specialists Constr. Grp., Inc., 394 F. App'x 285 (6th Cir. 2010) (per curiam) ("Laborers Pension Trust"). There, an employer had ceased making payments required by a collective bargaining agreement after sending a letter to the union stating its intention to terminate the agreement if the contract was not "negotiated to [its] satisfaction before the expiration date." Id. at 287. The Sixth Circuit explained that employers may only raise limited defenses in ERISA collection actions, and stated that one such defense exists if an employer shows that the agreement

10

no longer existed due to its termination.  Id. at 290.  The court stated that allowing "the assertion of a termination defense 'provided the inquiry is superficial . . . sensibly balances the competing interests in [a fund's] avoiding complex litigation . . . and ensuring that the employer has a legitimate contractual obligation to make employee contributions."  Id. (citation omitted). The court stated that for a termination to be effective "this limited inquiry must reveal that the employer unequivocally . . . communicat[ed] the intent to withdraw."  Id. (quoting Sheet Metal Workers' Int'l v. Herre Bros., Inc., 201 F.3d 231, 244 (3d Cir. 1999)).

In Laborers Pension Trust, the court concluded that there had been a successful termination of the collective bargaining agreement.  Id. at 292.  The court was able to reach that conclusion only after examining the language of the collective bargaining agreement in conjunction with the actions of the parties.  Id. at 291.  The court noted that in § 515 cases, there is no "four-corners-of-the-document rule" and thus courts could conduct a "cursory review of the parties' actions."  Id. (citation omitted) (emphasis in original).  The court reasoned that recognizing the termination defense and allowing for some investigation into the actions of the parties "creates little or no more expense or complexity than recognizing a termination defense bounded by the four corners of the notice-giving document."  Id. at 292.

It is undisputed by the parties here that the termination defense discussed by the Sixth Circuit in Laborers Pension Trust is an available defense to Defendant.  (Pls.' Suppl. Mem. in Opp'n to Def.'s Mot. for Summ. J at 5 [Doc. No. 38] ("[A]s recognized by the Sixth Circuit, the termination defense is valid."); (Def.'s Suppl. Mem. in Supp. of Mot.

11

for Summ. J. at 2–3 [Doc. No. 37] (arguing that Defendant terminated the Inside Agreement on November 25, 2009).)  This position comports with the Eighth Circuit's conclusion in Central States that a limited number of defenses are available to an employer in a § 515 action.  It is also fitting that the Sixth Circuit's announcement of the termination defense was specifically adopted because it "creates little or no more expense or complexity" in the action, a position which is supported by the Eighth Circuit's statement that Section 515 was meant to "simplify actions" and "avoid costly litigation."  Compare Laborers Pension Trust, 394 F. App'x at 292 with Central States, 919 F.2d at 1348.  Indeed, other circuits too have recognized such a termination defense.  See La. Bricklayers & Trowel Trades Pension Fund & Welfare Fund v. Alfred Miller Gen. Masonry Contracting Co., 157 F.3d 404, 409 n.12 (5th Cir. 1998) (noting that courts may consider a termination defense as long as the court's examination is superficial); DeVito v. Hempstead China Shop, Inc., 38 F.3d 651, 654 (2d Cir. 1994) (stating that employee benefit funds "are not entitled to enforce a nonexistent contractual obligation"); Teamsters Indus. Employees Welfare Fund v. Rolls-Royce Motor Cars, Inc., 989 F.2d 132, 138 (3d Cir. 1993) (same); see also Laborers Health & Welfare Trust Fund v. Fisher Dev., Inc., 81 F.3d 168 (9th Cir. 1996) ("[T]he fact that there may not be any contract at all to obligate an employer to pay is a different thing altogether.").  Therefore, the Court finds that the termination defense is available to Defendant here if it can show that the Letter of Assent and Inside Agreement were terminated based on the plain language of those agreements and the actions of the parties.

       In this case, like in Laborers Pension Trust, Defendant contends that it notified both

the IBEW and the NECA in writing on November 25, 2009, that it was terminating its authorization under the Letter of Assent. (Def.'s Mem. in Supp. of Mot. for Summ. J. at 4 [Doc. No. 22].) Defendant argues that "Plaintiffs expressly ratified [Defendant]'s termination of the Inside Agreement by acknowledging receipt of the termination letter on December 21, 2009, and acknowledging that [Defendant]'s legal obligations under the Inside Agreement would lapse effective April 30, 2010." (Def.'s Suppl. Mem. in Supp. of Mot. for Summ. J. at 1 [Doc. No. 37].) Defendant asserts that "there is no question that Plaintiffs . . . considered it to be an effective termination" as the letter contained no discussion of Defendant failing "to strictly comply with termination procedures" under the Inside Agreement. (Id. at 3.)

Additionally, Defendant argues that under the Inside Agreement it was required to submit monthly payroll reports to the IBEW and make contributions to Plaintiffs for any fringe benefits owed. (Id. at 3.) After Defendant notified Plaintiffs that it was terminating its relationship with the IBEW on November 25, 2009, Plaintiffs did not send any monthly payroll reports to Defendant to complete or make any contribution demands. (Id. at 3–4.) According to Defendant, the fact that Plaintiffs did not make any requests of Defendant after Defendant sent the November 25, 2009, letter "demonstrates that Plaintiffs accepted and implicitly ratified [Defendant]'s termination." (Id. at 4.) Moreover, Defendants argue that Plaintiffs' counsel's e-mails referencing Defendant's termination of its relationship with the IBEW is further evidence that it had effectively terminated the Letter of Assent and its obligations under the Inside Agreement. (Id. at 5.)

Plaintiffs respond that Defendant's November 25, 2009 letter did not terminate the

Letter of Assent and its obligations under the Inside Agreement. (Pls.' Mem. in Supp. of Mot. for Partial Summ. J. at 13 [Doc. No. 27].) Plaintiffs contend that the letter only expresses "displeasure" with the IBEW and "does not even mention NECA or the Letter of Assent, nor NECA's authority to act on [Defendant]'s behalf." (Id.) Furthermore, according to Plaintiffs, even if the Court were to find that Defendant's November 25, 2009 letter could be construed as a notice of termination, under the terms of the Inside Agreement "the employer is required to send a second written 10 day notice of termination." (Id. at 17.) Because Defendant did not write a follow up letter terminating the Letter of Assent and Inside Agreement, Plaintiffs assert that the Letter of Assent and Inside Agreement were never terminated. (Id.) Additionally, Plaintiffs argue that the Court cannot grant summary judgment in any event because there is a fact issue as to whether the NECA ever received the November 25, 2009 letter from Defendant. (Pls.' Mem. in Opp'n to Def.'s Mot. for Summ. J. at 8 [Doc. No. 29]; (Ohman Aff. ¶ 6 [Doc. No. 32]) (stating that the NECA has no record of receiving the November 25, 2009 letter from Defendant).)

The employer's termination defense in this case requires inquiry into both the plain language of the collective bargaining agreement and "the parties' conduct following a timely attempt to terminate." Laborers Pension Trust, 394 F. App'x at 292. While there is evidence in the record regarding the correspondence between the parties, there has been no showing about whether the employer used IBEW employees for covered work after its purported termination of the collective bargaining agreement. Such evidence would provide the court with a "cursory review of the parties' actions," which is a proper inquiry into whether the employer may assert a termination defense in an ERISA action. Id. at 291.

Additionally, the parties dispute whether the NECA received the purported November 25, 2009 termination notice from Defendant. The Court therefore concludes that summary judgment is improper at this time because genuine issues of material fact exist.

## III. ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED THAT:** Defendant's Motion for Summary Judgment [Doc. No. 20] and Plaintiffs' Motion for Partial Summary Judgment [Doc. No. 25] are **DENIED**.


Dated: April 4, 2013                    s/Susan Richard Nelson
                                        SUSAN RICHARD NELSON
                                        United States District Judge