# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Jeff Heimerl and Fred Jahnke, as<br>Trustees of the IBEW Local No. 292<br>Health Care Plan; Trustees of the Electrical<br>Workers Local No. 292 Pension Fund; as<br>Trustees of the Electrical Workers Local<br>No. 292 Annuity & 401(k) Fund; as<br>Trustees of the Electrical Workers Local<br>No. 292 Vacation & Holiday Fund; and as<br>Trustees of the Minneapolis<br>Electrical Industry Board/JATC/LMCC;<br>and each of their successors, | Case No. 12-CV-612 (SRN/SER) |
| | |
| **Plaintiffs,** | **FINDINGS OF FACT,<br>CONCLUSIONS OF LAW,<br>AND ORDER FOR<br>JUDGMENT** |
| **v.** | |
| Tech Electric of Minnesota, Inc., | |
| **Defendant.** | |

_____

Amanda R. Cefalu, Pamela Hodges Nissen, and Rebecca A. Peterson, Anderson, Helgen, Davis & Nissen, PA, 333 South Seventh Street, Suite 310, Minneapolis, Minnesota 55402, for Plaintiffs

Chad A. Kelsch, Fuller, Seaver, Swanson & Kelsch, P.A., 5500 Wayzata Boulevard, Suite 1025, Golden Valley, Minnesota 55416, for Defendant
_____

SUSAN RICHARD NELSON, United States District Court Judge

     This matter came before the undersigned Judge of the District Court for trial on

July 15 and 16, 2013.  Plaintiffs were represented by Pamela H. Nissen, Esq., and

Defendant Tech Electric of Minnesota Inc. ("Tech Electric") was represented by Chad A.

Kelsch, Esq.  Based on the evidence presented at trial and in post-trial submissions, the legal arguments in the parties' briefing, and all of the files and proceedings in this matter, the Court makes and enters the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

### Background

1.      Pursuant to § 502 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132, Plaintiffs seek to conduct an audit of Tech Electric's payroll and employment records, and to recover amounts due for any unpaid fringe benefit contributions owed on behalf of Tech Electric's employees for the period of January 1, 2009 to December 31, 2011 for hours worked within the jurisdiction of the IBEW Local 292 Inside Agreement.  (Stipulation ¶ 2  [Doc. No. 61]; Am. Compl. ¶¶ 16-24 [Doc. No. 18].)  Defendant claims that it is no longer bound to the applicable labor agreement for the period subsequent to May 1, 2010.  (Stipulation ¶ 2  [Doc. No. 61].)

2.      Plaintiffs Jeff Heimerl and Fred Jahnke are trustees (the "Trustees") of the IBEW Local No. 292 Health Care Plan, the Electrical Workers Local No. 292 Pension Fund, the Electrical Workers Local No. 292 Annuity & 401(k) Fund. the Electrical Workers Local No. 292 Vacation & Holiday Fund; and the Minneapolis Electrical Industry Board/JATC/ LMCC (collectively, "the Fringe Benefit Plans" or "the Plans"). (Pls.' Trial Exs. 3-6).

3.      The Plans for which the Plaintiffs are trustees are employee benefit plans, as defined under 29 U.S.C. § 1001, et seq.

4.      The Trustees' duties are to act on behalf of the Plans and the participants in the Plans.  (Tr.1 at 45; 89 [Doc. No. 67].)[1]

5.      The Plans are administered by Jody Roe-Hardie. (Id. at 49.)

6.      Defendant Tech Electric is a Minnesota corporation engaged in the electrical industry.  (Stipulation ¶ 1 [Doc. No. 61].)   The owner of Tech Electric is Scott Schmidt.  (Tr.1 at159 [Doc. No. 67].)

7.      The Minneapolis Chapter of the National Electrical Contractors Association ("NECA") is an employer association representing electrical contractors, primarily in the area of labor relations.  In that capacity, NECA negotiates collective bargaining agreements ("CBAs") with the local unions, including the International Brotherhood of Electrical Workers ("IBEW") Local Union Number 292 ("Local 292").  (Tr.1 at 76-77 [Doc. No. 67].)   Defendant estimates that only 25% of all licensed electricians belong to unions.  (Def.'s Letter Brief of 3/21/14 at 2 [Doc. No. 96].)

8.      Local 292 is a labor organization under the IBEW. (Pls.' Trial Ex. 2.)

9.      On October 20, 2000, Tech Electric signed a Letter of Assent as an "employer" authorizing the Minneapolis NECA Chapter to be the company's bargaining representative with respect to the Inside Collective Bargaining Agreement ("Inside Agreement") between the Minneapolis NECA Chapter and Local 292.  (Stipulation ¶ 3 [Doc. No. 61]; Pls.' Trial Ex. 1.)   The other signatory to the Letter of Assent, in the

---

[1]  Citations to the trial transcript of July 15, 2013 [Doc. No. 67] are indicated as "Tr.1," and citations to the trial transcript of July 16, 2013 [Doc. No. 68] are indicated as "Tr.2."

capacity of "union," was Local 292.  (Pls.' Trial Ex. 1.)

10.     The Letter of Assent bound Tech Electric to the terms of the Inside

Agreement between IBEW and NECA and authorized NECA to represent Tech Electric in

the bargaining of the Inside Agreement with Local 292.  (Tr.1 at 38-39 [Doc. No. 67]; Pls.

Trial Exs. 1 & 2.)

11.     The Inside Agreement was in effect from May 1, 2006 though April 30,

2010.  (Pls.' Trial Ex. 2, § 1.01.)   However, it contained an "evergreen provision," so that

unless changed or terminated, the Inside Agreement would continue in effect from May 1

until April 30 of each year.  (Id.)

12.     The Inside Agreement requires signatory employers, such as Tech Electric, to

make monthly contributions to the Plans for all hours its employees work within the

jurisdiction covered by the Agreement. (Stipulation ¶ 5 [Doc. No. 61]; Pls.' Trial Ex. 2.)

13.     Fringe benefit contributions must be made on a monthly basis on behalf of

all employees covered by the Inside Agreement for the purpose of funding employees'

healthcare, pension, vacation and educational benefits. (Stipulation ¶ 6 [Doc. No. 61]; Pls.'

Trial Ex. 2.)

14.     Per the Inside Agreement, employers such as Tech Electric are required to

compute their monthly contribution obligation and pay it to the agent of the Trustees on or

before the 15th day of the month following the month for which the contribution is being

made.  Employers are required to submit the fringe fund report to the Plaintiffs, or their

agent.   (Stipulation ¶ 7 [Doc. No. 61]; Pls.' Trial Ex. 2, § 6.13(c)(1).)   Employers submit

their monthly payment reports to the Plans electronically, and Plaintiffs' Plan Administrator believed that that was the case in 2010 as well.  (Tr.1 at 114 [Doc. No. 67].) Plaintiffs may also demand that employers furnish all necessary payroll and/or employment information for audit and examination, or any records deemed relevant in connection with the administration of the fringe benefit fund. (Stipulation ¶ 7 [Doc. No. 61]; Pls.' Trial Ex. 2, § 6.13(c)(1).)

15.    The Inside Agreement grants collection authority to appointed receiving agents to sue and collect for all monies due to any of the Funds.  (Pls.' Ex. 2, § 6.13(b).) In addition, the Inside Agreement vests the Trustees with the right to seek legal redress if an employer is delinquent in its contributions:

> The Trustees of any fringe benefit fund, may for the purpose of collecting any payments required to be made to such funds, including damages and costs and for the purpose of enforcing rules of the Trustees concerning the inspection and audit of payroll records, seek any appropriate legal, equitable and administrative relief. . . .  In the event it becomes necessary to commence any such legal, equitable or administrative action, arbitration or grievance procedure against any Employer, such Employer shall be obligated to pay to the respective fringe benefit fund, or funds, attorney's service of papers.

(Pls.' Ex. 2, § 6.13(c)(3).

16.    Pursuant to the Inside Agreement, when an employer fails to submit payment in a timely manner, or if the employer remains delinquent subsequent to the last day of the month following the month in which work was performed, the employer is required to pay a penalty of liquidated damages in the amount of 5% of the amount owed, or $1,000, whichever is greater.  (Pls.' Ex. 2, § 6.13(c)(2); Heimerl Aff. ¶ 8 [Doc. No. 85].)

17.     The Inside Agreement covers the Local 292 jurisdiction, which comprises the following geographical areas:  Belle Plaine, Minnesota to just north of St. Cloud and west to the South Dakota border.  Specifically, the counties include all of Hennepin, Carver and Scott Counties, and all that part of Anoka County containing these Cities:  Andover, Anoka, Columbia Heights, Coon Rapids, Fridley, Hilltop, Ramsey and Spring Lake Park; all of Wright County and that portion of Benton and Sherburne Counties east of State Highway 25 to Highway 10 and an imaginary line straight west to the Mississippi River. (Tr.1 at 42 [Doc. No. 67], Pls.' Trial Ex. 2 at 1.)

18.     The obligations under the Inside Agreement are triggered by work performed by signatory employers within the stated jurisdiction:  "[t]his Agreement shall apply in the [Local 292] geographical area," and "shall apply to all firms who sign a Letter of Assent to be bound by the terms of this Agreement."  (Pls.' Trial Ex. 2 at 1.)

19.     Named Plaintiff Jeff Heimerl, a Trustee of Local 292, and representative of the Plans, testified that non-signatory electrical contractors may perform work in the Local 292 jurisdiction.  (Tr.1 at 71 [Doc. No. 67].)  Performing work in the Local 292 jurisdiction does not trigger obligations for employer contributions or for submitting payroll information to the Plans unless the employer is a signatory to the Inside Agreement.  (Id. at 71-73.)

20.     The Agreement covers the following time period:

Section 1.01.  AGREEMENT DATES - This Agreement shall take effect May 1, 2006, and shall remain in effect until April 30, 2010, unless otherwise specifically provided for herein.  It shall continue in effect from

year to year thereafter from May 1 until April 30 of each year, unless
changed or terminated in the way later provided herein.

(Pls.' Trial  Ex. 2, Art. I, § 1.01.)

21.     Collectively, the Letter of Assent and the Inside Agreement contemplate

three different, potentially relevant periods of notice: 150 days, 90 days, and 10 days.

(Pls.' Trial Ex. 1; Pls.' Trial Ex. 2, § 1.02(a) & (d).)  The Letter of Assent and the Inside

Agreement each contain general notice provisions.  The Letter of Assent provides that it

"shall remain in effect until terminated by [Tech Electric] giving written notice to the

Minneapolis Chapter, [NECA] and to the Local Union at least one hundred fifty (150)

days prior to the then current anniversary date of the applicable approved labor

agreement."  The Inside Agreement, on the other hand, provides that "an Employer

withdrawing representation from the Chapter…desiring to change or terminate this

Agreement must provide written notification at least ninety (90) days prior to the

expiration date of the Agreement or any anniversary date occurring thereafter."  (Tr.1 at

40; 45; 77-78; 82-83 [Doc. No. 67]; Pls.' Trial Exs. 1 & 2.)

22.     The Inside Agreement also provides for additional notice in a specific

context: voluntary, 10-days' additional notice after the expiration period of the Inside

Agreement to give the parties an opportunity to possibly salvage the relationship and avoid

termination:

> In the event that either party, or an Employer withdrawing
> representation from the Chapter . . ., has given a timely notice of
> proposed changes and an Agreement has not been reached by the
> expiration date or by any subsequent anniversary date to renew,

7

> modify, or extend this Agreement . . . either party or such an
> Employer, <u>may</u> serve the other a ten (10) day written notice
> terminating this Agreement.  The terms and conditions of this
> Agreement shall remain in full force and effect until the expiration of
> the ten (10) day period.

(Pls.' Trial  Ex. 2, Art. I, § 1.02(d)) (emphasis added).

23.    The purpose of the termination requirements is to provide notice to Local 292

and NECA of an employer's wish to terminate its participation in the Inside Agreement.

(Tr.1 at 95 [Doc. No. 67].)

24.    If the Letter of Assent is not terminated, it remains in effect and is renewed

with each successive CBA.  (Tr.1 at 78 [Doc. No. 67]; Pls.' Trial Ex. 1.)    Negotiations for

successive agreements usually commence several months in advance of the expiration

date.  (Tr.1 at 151 [Doc. No. 67].)  Thus, negotiations for a successive agreement with an

April 30 expiration date would typically begin a few months earlier, in January or

February.  (<u>Id.</u>)

25.    The Plaintiffs/Trustees, who are not signatory parties to the Letter of Assent

or to the Inside Agreement, do not negotiate the terms of the Inside Agreement. (Tr.1 at

49-50; 89-90 [Doc. No. 67].   Nor are they authorized to terminate either agreement.  (Tr.1

at 59; 90 [Doc. No. 67].)   The Plaintiffs/Trustees Plaintiffs are third-party beneficiaries of

the Inside Agreement.  (Pls.' Trial Ex. 2; <u>see</u> <u>also</u> Tr.1 at 28; 124-25 [Doc. No. 67].)

26.    At no point did anyone from NECA or Local 292 review the contents of the

Inside Agreement with Tech Electric or Schmidt, including the termination provision.   (<u>Id.</u>

at 26.)

**Termination Letter**

27.    On or about November 25, 2009, Scott Schmidt of Tech Electric sent a letter to Tony Maghrak, then the Business Manager of Local 292, advising that Tech Electric was withdrawing from any affiliation with Local 292.  In the letter, Schmidt stated, "It is the intent of Tech Electric to immediately withdraw from any affiliation from IBEW #292."   Tech Electric copied NECA's then-Chapter Manager Jeff Ohman on the letter and sent a copy of the letter to NECA.  Schmidt's  purpose in sending the letter was to terminate Tech Electric's obligations under the Inside Agreement.  (Tr.1 at 163-164 [Doc. No. 67]; Tr.2 at 39 [Doc. No. 68]; Pls.' Trial Ex. 7.)

28.    Scott Schmidt testified that multiple reasons led him to terminate the Inside Agreement including his belief that Local 292 was unwilling to negotiate, as well as concerns about Local 292's handling of audits and working dues.  (Tr.2 at 66-67 [Doc. No. 68].)

29.    Tech Electric's November 25, 2009 termination letter, sent 90 days prior to the April 30, 2010 expiration date of the Inside Agreement, is consistent with § 1.02(a) of the Agreement, under which termination notice was due by January 30, 2010.  (Pls.' Trial Ex. 2, Tr.1 at 52 [Doc. No. 67].)  Moreover, it complies with the 150-day notice requirement of the Letter of Assent, under which termination notice was due by December 1, 2009.  (Pls.' Trial Ex. 1.)

30.    Plaintiff Jeff Heimerl testified to his understanding that Tech Electric did not provide the voluntary follow-up written notice 10 days after the Inside Agreement's expiration date of April 30, 2010.   (Pls.' Trial Ex. 2, § 1.02(d); Tr.1 at 67 [Doc. No. 67]; see also T.2

9

at 16 [Doc. No. 68].)

31.     Scott Schmidt of Tech Electric believes that in the spring of 2010 he re-sent the November 25, 2009 termination letter to Local 292 and NECA.   (Tr.1 at 163-64 [Doc. No. 67].)

32.     Jeff Ohman of NECA testified that he did not receive a copy of Tech Electric's November 25, 2009 termination letter until sometime in 2010.  (Tr.1 at 84-85 [Doc. No. 67].) Ohman was aware of Tech Electric's notice of termination by virtue of receiving Local 292's letter of December 21, 2009 from Tony Maghrak to Mr. Ohman.  (Pls.' Trial Ex. 11.)

## Local 292 Grievance Letter

33.      In his former capacity as Local 292's Business Manager, Tony Maghrak represented union members under various contracts in the electrical industry.  (T.1 at 144 [Doc. No. 67].)  Maghrak has also formerly served as a Trustee of the Plans.  (Id.)

34.     On or about December 21, 2009, Local 292, through Maghrak, notified Jeff Ohman of NECA in a written grievance that it had received Tech Electric's November 25, 2009 termination letter and that it took exception to Tech Electric's attempt to prematurely repudiate its obligations under the Inside Agreement.  Maghrak indicated that the terms of the Inside Agreement did not expire until April 30, 2010.  Maghrak requested that "Tech Electric be ordered to comply with all terms and conditions of the [Inside] Agreement through April 30, 2010 for all electrical work performed by [Tech Electric] within the scope of the IBEW's jurisdiction."   (Pls.' Trial Ex. 11; Tr.1 at 147 [Doc. No. 67].)

35.     Tony Maghrak testified that as of the date of his December 21, 2009 grievance

10

letter, Tech Electric was bound by the Inside Agreement through April 30, 2010. (Tr.1 at 150-51 [Doc. No. 67].)   Maghrak stated that Tech Electric might have been obligated to make future contributions by any Inside Agreement that would have been negotiated subsequently:

> Q:   . . .[I]s it your opinion, as of the date of this letter, that Tech Electric then had no further obligations after April 30 of 2010 relative to the [CBA]?
>
> A:   Well, I believe in the letter we're stating the fact that at that date that that letter was written, that is the expiration date of the current [CBA]. So, the employer at that time period would have been obligated by that, but it does not mean that they would not have been obligated by any Agreement that would have been negotiated after that.

 (Tr.1 at 150-51 [Doc. No. 67].)

36.    In his December 21, 2009 letter, Maghrak did not refer to any additional steps required of Tech Electric to finalize termination, nor did he indicate that Tech Electric's termination was ineffective after April 30, 2010.   (Pls.' Trial Ex. 11; Tr.1 at. 157 [Doc. No. 67].)   Maghrak testified that he was unaware of all of the requirements for termination of the Inside Agreement, but testified that people on his staff "performed those functions." (Tr.1 at 152 [Doc. No. 67].)

37.    Maghrak copied Tech Electric on the December 21, 2009 letter.  (Pls.' Trial Ex. 11.)

38.    Maghrak did not follow up with NECA about Tech Electric's termination.  (Tr.1 at 154.)  He believes that he referred the matter to Dan McConnell in his office.  (Id. at 145.)

39.    Jeff Ohman, Chapter Advisor for the Minneapolis NECA Chapter, received Maghrak's December 21, 2009 letter shortly after it was mailed, sometime in 2010.  (Tr.1 at

85-86 [Doc. No. 67].)  Ohman testified that he understood that Tech Electric was attempting to terminate the Inside Agreement.  (<u>Id.</u> at 96.)

40.    Shortly after Ohman reviewed the NECA grievance letter, he believed that Tech Electric had not properly terminated, but did not communicate this belief to Local 292 or Tech Electric.  (<u>Id.</u> at 97.)

41.    Ohman considered Tech Electric's termination of the agreement, prior to April 30, 2010, to be premature.  (<u>Id.</u> at 98.)

42.    While the Letter of Assent requires employers to provide written notice of termination to Local 292 and NECA (Pls.' Ex. 1), Ohman understood that the Inside Agreement's termination provisions in § 1.02 did not expressly refer to giving notice to NECA.  (<u>Id.</u> at 100.)

### <u>Conduct Related to Tech Electric's Termination of the Inside Agreement</u>

43.    Plaintiff Jeff Heimerl, a Trustee for the Plans as of 2011, was a Business Representative at Local 292 at the time Tech Electric sent the November 25, 2009 letter.  (<u>Id.</u> at 35.)  Heimerl also serves as Local 292's elected President.  Heimerl testified that his duties as a Trustee require him to act in the best interest of the Plans and participants in the Plans.  (<u>Id.</u> at 45.)  As a Local 292 Business Representative, his primary duties involved contract negotiations and enforcement.  (<u>Id.</u> at 36.)  While the functions performed by Local 292 and his duties for the Plans are different, Heimerl acknowledged that they are related, in that signatory union employers contribute to the Plans.  (<u>Id.</u> at 61.)  Similarly, Jeffrey Ohman serves both as a Trustee to Local 292 and as the Chapter Advisor of the Minneapolis Chapter

of NECA.  (Id. at 75; 88-89.)  Ohman noted that as a Trustee, he is required to act in the best interests of the Plans and the participants, "and that can differ from how you may represent a contractor under the [CBA]."  (Id. at 89.)   In addition, Ohman acknowledged that although he is a NECA employee, he was not representing Tech Electric in his testimony at trial, because his role as a Trustee is different than that of a contract representative.  (Id. at 92-95.)

44.     Jody Roe-Hardie is the Plan/Fund Administrator for Plaintiffs, and has served in this capacity at all times relevant to this action.  Her primary job responsibilities are the processing of reports and payments from employers bound to the Inside Agreement, the monitoring of reports and payments, and the issuance of delinquency notices.  She takes her direction directly from Plaintiffs.  (Id. at 48-49; 111-112; 116-117 [Doc. No. 67].)

45.     Roe-Hardie and those in her office routinely send out delinquency notices even if an employer is involved in collections or a lawsuit.  (Id. at 140-141.)   In addition to sending out delinquency notices directly, the Plans may notify their legal counsel if an employer, such as Tech Electric, fails to submit the required reports and contributions.  (Id. at 69; 137.)

46.     If the employer is a solo owner-operator, such a person may not be working every month, so if a solo owner-operator fails to submit monthly payments to the Plans, the Plans might not immediately refer the matter to the counsel.  (Id. at 121.)

47.     Roe-Hardie was very familiar with Tech Electric, having handled many separate instances of Tech Electric's alleged delinquencies.  (Id. at 114.)   As of the spring of 2010, it was Roe-Hardie's understanding that Tech Electric owed the Plans approximately $100,000 for prior delinquencies that had been reduced to judgment.  (Id.)

48.    Roe-Hardie could not recall if her office sent any delinquency notices to Tech Electric at any time after April 30, 2010.  (Id. at 132; 140.)

49.    Roe-Hardie first saw Tech Electric's November 25, 2009 letter  in early 2010. (Id. at 114.)  She testified that "[t]he union hadn't sent it to us.  There's no reason for us to receive something like this because that's something that is more of a union and management issue than a trust issue for me."  (Id.)  Roe-Hardie also testified that she received the letter by fax from the union office.  (Id. at 133.)

50.    When the Plans are notified of a termination, the Plans start an audit process and then take steps to determine withdrawal liability in order to ensure that all of the terminating employer's contributions are correctly accounted for.  (Id. at 120.)  The Plans took no such actions based on the November 25, 2009 letter, because Roe-Hardie "didn't know if it was a true termination, so there wasn't anything that would have flagged me to send out for an audit."  (Id. at 122.)

51.    Roe-Hardie testified that in March or April of 2010, Tony Maghrak of Local 292 informed her that the November 25, 2009 letter was not an effective termination.  (Id. at 133-34; 137.)  Maghrak denies ever making such a statement.   (Id. at 158.)

52.    The Plans did not send a default notice to Tech Electric.   (Id. at 133-34.) Instead, after Tech Electric did not make a payment on May 15, 2010, Roe-Hardie referred the matter to Amanda Cefalu, legal counsel for the Plans, because the Plans, represented by Ms. Cefalu, were already involved in a collection process with Tech Electric. (Id. at 134-38.)

53.     Tech Electric took no exception to Local 292's stated position in Tony

Maghrak's December 21, 2009 letter that Tech Electric be required to comply with the terms of the Inside Agreement through April 30, 2010.  (Tr.2 at 42 [Doc. No. 68].)  Scott Schmidt testified that Tech Electric did in fact comply with the terms of the Inside Agreement through April 30, 2010.  (Id.)

54.    After sending the November 25, 2009 termination letter, Tech Electric did not attempt to negotiate with Local 292 regarding the Inside Agreement or any terms relative to the Inside Agreement.  (Tr.1 at 165-66 [Doc. No. 67].)   Also, neither NECA or Local 292 attempted to negotiate with Tech Electric.  (See id. at 152.)

55.    Prior to the initiation of this lawsuit on March 8, 2012, no one from Local 292 or NECA, or anyone claiming to represent their interests, had advised Tech Electric that Tech Electric's termination was ineffective.  (Id.)

56.    After Tech Electric's submission of its November 25, 2009 letter and prior to the initiation of this lawsuit on March 8, 2012, a period of more than 27 months, Plaintiffs made no demands on Tech Electric for the filing of fringe fund reports, the payment of contributions, or the initiation of an audit for any time after the expiration of the CBA on April 30, 2010, nor did Local 292 or NECA make any such demands.  (Id. at 42-43.)

57.    It was Tech Electric's understanding, based on the conduct of Local 292 and NECA, that Tech Electric was no longer bound to the terms of the Inside Agreement after April 30, 2010.   (Tr.2 at 43-44.)

**Prior Litigation Between the Parties**

58.    A past dispute between Tech Electric and Local 292 resulted in the Plans

commencing suit against Tech Electric on or about September 8, 2008 in this Court,  Maghrak v. Tech Electric of Minnesota, Inc., Civ. No. 08-5133 (RHK/JSM).  In the 2008 lawsuit, the Plans alleged that Tech Electric had failed to submit installment payments pursuant to an approved Chapter 11 bankruptcy plan and breached the terms of the Inside Agreement by failing to timely submit fringe fund reports and contributions.  (Tr.2 at 29 [Doc. No. 68]; Def.'s Trial Ex. 5.)

59.     On August 20, 2009, the Court ordered judgment against Tech Electric for fund contributions owed pursuant to the Chapter 11 plan and for the period May 2008 through August 20, 2009.  The Court ordered Tech Electric to submit the outstanding fringe fund reports within ten days of being served with the Order, and directed Plaintiffs to calculate the amount owed based on these reports and to submit it to the Court in affidavit form for entry of a final judgment.  On November 20, 2009, the Court entered judgment against Tech Electric in the amount of $150,519.81.  (Tr.2 at 29-33 [Doc. No. 68]; Def.'s Trial Exs. 6 & 7.)

60.     At no time prior to entry of the November 20, 2009 judgment did Plaintiffs inform Tech Electric that the fringe fund reports that Tech Electric submitted were inaccurate or incomplete.  (Tr.2 at 31 [Doc. No. 68].)

61.     On or about December 7, 2009, the Plans commenced another lawsuit against Tech Electric in this Court, (Maghrak v. Tech Electric of Minnesota, Inc., Civ. No. 09-3474 (MJD/AJB), alleging that Tech Electric had failed to submit fringe benefit reports and to pay all contributions due for the months of September 2009 and October 2009.  (Tr.2 at 33-34;

16

Def.'s Trial Ex. 8.)

62.     On March 19, 2010, the Court granted the Plans' motion for default judgment, finding that the Plaintiffs were entitled to judgment against Tech Electric for the period September 2009 through December 2009 in the amount of $22,510.18.  The Court entered judgment against Tech Electric on the same day in the amount of $24,858.69, which amount included attorney' fees and costs.   (Tr.2 at 34-37; Def.'s Trial Exs. 9 & 10.)

63.     At no time prior to entry of the March 19, 2010 judgment did Plaintiffs inform Tech Electric that the fringe fund reports that Tech Electric submitted were inaccurate or incomplete.   (Tr.2 at 37.)

64.     At some point in approximately the fall of 2010, Tech Electric and the Plans subsequently entered into an agreement to address the payment of these two judgments. (Tr.2 at 38-39 [Doc. No. 68].)  Pursuant to this agreement, Plaintiffs received, as garnishment, a percentage of profits made from jobs that Tech Electric performed on behalf of its customers Cargill and the Mosaic Company.  (Id.)   The garnishments continued until the initiation of the instant lawsuit.  (Id. at 39.)

65.     Scott Schmidt, the author of the November 25, 2009 letter, had no conversations with Local 292 regarding the letter.  (Tr.1 at 173 [Doc. No. 67].)  Schmidt attempted to speak with representatives of Local 292 about issues regarding working dues and the then-pending litigation in federal court.  (Id.)  Dan McConnell of Local 292 referred Schmidt to Amanda Cefalu, legal counsel for Plaintiffs.  (Id.; Tr.2 at 45 [Doc. No. 68].)

66.     Schmidt viewed his November 25, 2009 letter as addressing a combination of

issues – working dues, the federal court litigation, and termination of the Inside Agreement.

(Id. at 174.)   In the November 25, 2009 letter, Schmidt referred to issues related to Tech

Electric's past obligations and expressed his intent to terminate the Inside Agreement:

> Tech Electric has experienced great difficulties in collections, and the legal
> process required to recoup owed funds.  Along with this fact, and the response
> of local #292 regarding these matters  [sic].  It is the intent of Tech Electric to
> immediately withdraw from any affiliation with IBEW #292.
>
> Tech Electric continues to work through the legal system to recoup funds owed,
> and to repay past obligations.  But these are long processes that are never
> resolved soon enough for anyone.  Tech Electric will not recognize additional
> penalties while attempting to recover, and working with legitimate and reasonable obligations.

(Pls.' Trial Ex. 7.)

## **Communications Between Plaintiffs' Counsel and Defendant**

67.    Prior to the trial in the instant case, Defendant listed attorney Amanda Cefalu as

a witness in its pre-trial filings, noting that counsel's anticipated testimony would cover: (1)

Plaintiffs' understanding and acknowledgment of Tech Electric's termination of the Inside

Agreement; (2) the two previous lawsuits initiated by Plaintiffs and reduced to judgments; and

(3) payments and collection activities related to the two previous lawsuits.  (Defendant's

Witness List [Doc. No. 48].)   Plaintiffs moved to exclude any evidence and testimony

"relating to settlement correspondence with Defendant," arguing that the underlying

communications were inadmissible under Fed. R. Evid. 408 as evidence regarding settlement

and were also inadmissible parol evidence.  (Pls.' Mot. in Limine at 1-5 [Doc. No. 53].)  This

Court denied Plaintiffs' Motion in Limine, finding that the evidence was not subject to

exclusion pursuant to Rule 408, as it was not offered to prove or disprove the validity of the

claims in this case, but was rather offered to determine the parties' agreement to settle claims from the parties' prior two lawsuits.  (Order of 7/3/13 at 9-10 [Doc. No. 59].)  In addition, the Court found the evidence not excludable as parole evidence, because, in this specific ERISA context, evidence of conduct is admissible to determine whether a party has successfully terminated a CBA.  (Id. at 7-8) (citation omitted).

68.     Schmidt testified that he understood that Ms. Cefalu handled legal matters for Local 292, because a Local 292 representative, Dan McConnell, had referred Schmidt to Cefalu regarding legal matters.  (Tr.1 at 46 [Doc. No. 67].)  A January 7, 2010 email from Schmidt to Cefalu documents Tech Electric's confusion and frustration concerning whom to contact: "Tech contacted union 292 regarding this matter[;] the union claims they do not handle these issues.  Who is directing your efforts if not local #292?"  (Pls.' Trial Ex. 16.) Cefalu testified that she had multiple conversations with Schmidt in which she indicated that she did not represent the union.  (Tr.2 at 92-93 [Doc. No. 68].)  Cefalu believed that Schmidt understood that she did not represent Local 292.  (Id.)  On one occasion, rather than simply referring Schmidt back to the union, Cefalu contacted the union herself in order to determine to whom Schmidt should direct his communication.  (Id. at 93.)

69.     Attorney Cefalu does not represent Local 292 and did not have authority to negotiate or terminate the Inside Agreement.  (Tr.1 at 152-53 [Doc. No. 67].)

70.     Cefalu and Schmidt communicated via email and by telephone in 2009 and 2010 concerning collection efforts for the fringe benefit contributions that had been the subject of the earlier litigation, which was then pending.  (Tr.2 at 107-09 [Doc. No. 68].)  In addition,

Cefalu deposed Schmidt in December 2009 regarding these past periods of delinquency. (Id. at 107.) Schmidt does not recall if he forwarded Cefalu a copy of the November 2009 letter during any of these interactions or communications. (Tr.2 at 73-74 [Doc. No. 68].) During these communications, Schmidt indicated that due to Tech Electric's debt, he would be the sole Tech Electric employee in the future. (Id. at 107-09.) Cefalu and Schmidt further discussed Schmidt's desire to operate as a union employer "going forward," and Schmidt indicated his plan to talk to Maghrak and re-sign as a union employer. (Id. at 103.)

71.     Cefalu did not have any discussions with anyone representing Local 292's interests regarding Tech Electric's termination, including Tony Maghrak, prior to the initiation of this lawsuit. (Id. at 82-83.) Likewise, Tony Maghrak testified that he never communicated to Plaintiffs' legal counsel that Tech Electric's termination was ineffective, and is not aware of anyone who would have communicated this to Plaintiffs' legal counsel. (Tr.1 at 157-158 [Doc. No. 67].) Plaintiff Jeff Heimerl, a Business Representative at Local 292, its elected President (id. at 35), and a Trustee of the Plans, does not believe that he notified Plaintiffs' legal counsel that Tech Electric's termination was ineffective. (Id. at 210.)

72.     Jeff Ohman at NECA was the only person with whom Cefalu spoke about Tech Electric's termination. Cefalu spoke with Ohman at the end of 2011, approximately two years after Tech Electric had submitted its termination notice and approximately three months prior to the commencement of this lawsuit. (Tr.2 at 83-85 [Doc. No. 68].) Ohman testified that Tech Electric's November 25, 2009 letter – albeit not the typical letter of termination, because it sought immediate termination – expressed Tech Electric's intent to withdraw from any

20

affiliation with Local 292. (Tr.1 at 87 [Doc. No. 67].)

73. On April 6, 2010, approximately four months after Tech Electric had submitted its November 25, 2009 termination letter, Cefalu emailed Schmidt, stating in relevant part that Plaintiffs were willing to enter into a joint payment agreement with Tech Electric and the Mosaic Company to ensure that "benefits owed on work performed through May 2010 (since [Tech Electric] abrogated the CBA) are paid. . . ." (Def's. Trial Ex. 11.)

74. Schmidt understood this statement to be an acknowledgment on the part of Plaintiffs that Tech Electric had in fact terminated the Inside Agreement. (Tr.2 at 49-50 [Doc. No. 68].)

75. At the time that Cefalu made this statement, she possessed a copy of Tech Electric's November 25, 2009 termination letter, and based her statement on the contents of this letter. (Id. at 101.)

76. It was Cefalu's belief that Tech Electric was attempting to abrogate the Inside Agreement. (Id. at 91.) Cefalu did not consult with either Local 292 or NECA before forming her belief that that the Inside Agreement had been abrogated by Tech Electric. (Id. at 102-10..) Cefalu considers "abrogation" to be a precursor to termination, and not synonymous with "termination," explaining, "[m]y understanding of it is that when you abrogate something, you're giving notice that you're going to terminate something." (Id. at 95-96.)

77. On May 13, 2010, approximately five months after Tech Electric submitted its November 25, 2009 termination letter, Cefalu emailed Schmidt, stating in relevant part that

she had discussed with Plaintiffs the proposed payment arrangement to resolve the outstanding judgments against Tech Electric, and that as part of that payment arrangement, Plaintiffs would require Tech Electric "to stipulate to the entry of judgment for the amount due for January 2010 through April 30, 2010 (when the union contract ended – because you terminated it I believe)."   (Def.'s Trial Ex. 12, Tr.2 at 51-53 [Doc. No. 68].)

78.     As of the date of this May 13 email, it was Cefalu's belief that Tech Electric had now terminated the Inside Agreement, despite Tech Electric having taken no additional action since its November 25, 2009 termination letter.   (Tr.2 at 98 [Doc. No. 68].)   In none of her communications with Tech Electric did Cefalu indicate that Tech Electric failed to follow any particular steps in terminating the Inside Agreement.   (Id. at 98-100.)

79.     Cefalu describes her statements in the April 16 and May 13 emails as "sloppy," and testified that she independently formed the opinion that Tech Electric had abrogated and then terminated the Inside Agreement.   (Id. at 101-102.)

80.     On August 5, 2010, approximately eight months after Tech Electric had submitted its November 25, 2009 termination letter, Cefalu emailed Schmidt, inquiring whether Tech Electric had "re-signed with the union" and advising that Tech Electric would have no liability after April 30, 2010 if Tech Electric had not re-signed. (Id. at 53; Def.'s Trial Ex. 13.)

81.     Schmidt responded five days later, confirming that Tech Electric had not re-signed with Local 292.   (Tr.2 at 54 [Doc. No. 68]; Def.'s Trial Ex. 13.)

82.     During this period of time, Cefalu recalls discussing Schmidt's desire to operate

22

as a union employer "going forward," and Schmidt indicated his plan to talk to Maghrak and re-sign as a union employer. (Tr.2 at 103; 107-09 [Doc. No. 68].)

### Subsequent Conduct

83.     Joseph Opat, Dale Simon, and Paul Snaza worked a total of 272 hours on behalf of Tech Electric in the Local 292 jurisdiction for the period January 1, 2010 through April 30, 2010. (Schmidt Aff. ¶ 2 [Doc. No. 80]; Ex. 1 to Schmidt Aff.)

84.     In particular, Joe Opat was employed as an electrician with Tech Electric from approximately 2003 through at least July 15, 2013. During this time, Opat was a member of Local 292 and continued to pay membership dues through 2013. (Tr.1 at 55-58, 107-08 [Doc. No. 67]; Pls.' Trial Ex. 43.)

85.     Through at least April 12, 2013, Local 292's records continued to identify Tech Electric as an employer signatory to the Inside Agreement. (Pls.' Trial Ex. 43.) Tech Electric's records also list Joe Opat and Scott Schmidt as Local 292 members working at Tech Electric. (Id.) Schmidt, a licensed electrician as well as the owner of Tech Electric, paid union membership dues through at least December 31, 2012. (Id.; Tr.1 at 159-60 [Doc. No. 67].)

86.     Tech Electric and its employee Mr. Opat, performed electrical work on the Lowry Café in the fall of 2010. (Tr.1 at 104-05 [Doc. No. 67].)

87.     The owner of Lowry Café, Darryl Weivoda, worked with Tech Electric for a number of years and understood that Tech Electric's owner, Scott Schmidt, was a union member. (Id.) At the time of the 2010 work, Weivoda was not informed that Tech Electric

was not a union employer.  (Id.)

88.    Either Scott Schmidt or Joe Opat of Tech Electric also performed electrical work for Mosaic Crop Nutrition, both before and after May 2010.  (Id. at 178-179; Pls.' Trial Ex. 19).   The electrical work performed was located in Savage, MN.  (Tr.1 at 179-180 [Doc. No. 67].)

89.    Lisa Jo Brickey, Mosaic Crop Nutrition's Warehouse Manager, testified that she does not ask any contractors whether they are union employers because "[t]hat doesn't make any difference to us."  (Id. at 180).  Accordingly, she did not have a discussion about Tech Electric's union membership. (Id.)  Brickey recalled that Tech Electric's rates remained the same after May 2010.  (Id.)

90.    Both before and after May 2010, Joe Opat and Scott Schmidt of Tech Electric performed electrical work for Cargill, Incorporated at its facility located in Savage, MN.  (Id. at 183-184).

91.    George Pappajohn, a Facility Manager at Cargill, testified that he had no knowledge of whether Tech Electric was a union contractor and had never talked to Scott Schmidt about that issue.  (Id. at 186.)

92.    Tech Electric employed Dale Simon as a wireman from about 2001 through July 2011.  (Id. at 189-190).  Simon was a member of Local 292, and continues to be a member of Local 292.  Simon performed electrical work for Tech Electric subsequent to May 1, 2010 in the jurisdiction of the Local 292 contract.  (Id. at 190.)  After May 1, 2010, Simon believed that he continued to be paid the same rate that he had received prior to May 1, 2010.  (Id. at

192, 202-203; <u>see</u> <u>also</u> Pls.' Trial Ex. 52.)

93.    Simon maintained a Time Sheet, which he turned into the Tech Electric office on a regular basis.  (Tr.1 at 194 [Doc. No. 67].)  He also completed Service Orders /Field Requests identifying the type of work and location of the work that he performed.  (<u>Id.</u> at 193.)  Simon's Time Sheet, a form provided to him by Tech Electric, indicated "Union# 292" next to the "Employee" line on the form.  Simon's forms continued to identify him as a Local 292 member subsequent to May 1, 2010. (Pls.' Trial Ex. 52 at 3; 5-7.)

94.    Simon was aware that Tech Electric was experiencing some difficulties concerning unpaid union benefits. (Tr.1 at 197; 202-03 [Doc. No. 67].)  While Simon did not think that Schmidt expressly told him that Schmidt had terminated the Inside Agreement (<u>id.</u> at 197), Schmidt informed Simon that Tech Electric would not stay with the union once the union benefits issues were resolved.  (<u>Id.</u> at 202.)

95.    In the summer of 2011, Chad Johanson was referred to Tech Electric by Local 110 as a summer helper.  (<u>Id.</u> at 205-206.)  Johanson worked with approximately three others at Tech Electric, including Joe Opat and Dale Simon, whom he was informed were members of Local 292.  (<u>Id.</u> at 207.)  Johanson's understanding was that Tech Electric was a Local 292 contractor.  (<u>Id.</u>)  Schmidt did not inform Johanson that Tech Electric was not a Local 292 contractor, although neither did his union member coworkers, Opat and Simon.  (<u>Id.</u> at 207-08.)

**Damages**

96.   During this litigation, Tech Electric produced quarterly payroll reports maintained by Automatic Data Processing, Inc. ("ADP"),  the payroll processing company with which Tech Electric contracted for payroll services.  (See Tr.1 at 175 [Doc. No. 67].)  Scott Schmidt testified that Tech Electric retains quarterly statements, which would include amounts contained in weekly payroll documents, and that Tech Electric produced everything in its possession.  (Id. at 176-77.)   Tech Electric also produced invoices to certain customers for the period of approximately May 2010 through March 2011. (Pls.' Trial Ex. 19.)   Tech Electric did not produce time cards or time sheets.   (Id. at 174.)

97.   As for Plaintiffs' claims covering the period of January 1, 2009 through December 31, 2009, in the Amended Complaint, Plaintiffs requested an audit from January 1, 2009 to the present.   (Am. Compl., Prayer for Relief ¶ 4 [Doc. No. 18].)   In addition, Plaintiffs seek judgment for all unpaid fringe benefit contributions and liquidated damages discovered to be due during the audit period of January 1, 2009 to the present.  (Id. ¶ 5.)  At the conclusion of Plaintiffs' case at trial, Plaintiffs moved for judgment as a matter of law entitling Plaintiff to audit Tech Electric for that time period.  (Tr.2 at 18 [Doc. No. 68].) Defense counsel conceded that Tech Electric was bound by the Inside Agreement through April 30, 2010, and did not dispute its obligation to make any such payments to Plaintiffs, once the damages were quantified.  (Id. at 19.) Finding no contest as to Plaintiffs' entitlement to an audit prior to April 30, 2010, the Court granted Plaintiffs' motion to audit Tech Electric for the period from January 1, 2009 through April 30, 2010.  (Id. at 22.)  However, the Court

denied Plaintiffs' motion to the extent that it related to damages for this period, indicating that the parties disputed whether some of the pre-termination damages had already been satisfied by earlier judgments. (Id. at 22.) The Court noted that it would review the issue when the damages evidence was submitted. (Id.)

98.     After the liability phase of the trial, Plaintiffs subpoenaed additional payroll records from ADP for the audit and, with the Court's approval, the parties submitted damages evidence on the papers. (Minutes of 11/5/13 Telephone Status Conference [Doc. No. 77].) Tech Electric agreed it would produce all Service Orders listing hours worked by its employees during the audit period.

99.     Plaintiffs retained Legacy Professionals to perform an audit of Defendant's records, which was conducted by auditor Nathan Grochow. (Grochow Aff. ¶ 1 [Doc. No. 82].) Typically, employers subject to an audit are required to produce a complete set of payroll and employment records, including weekly payroll reports or registers, time cards or time sheets, and quarterly state or federal wage reports. (Id. ¶ 3.) The employer's payroll and employment records are then compared to the fringe benefit reports and the contributions remitted by the employer during the audit period. (Id. ¶ 4.)

100.    Grochow attests that he was not provided a complete set of records for his audit, but instead reviewed a limited set of documents provided to him by Plaintiffs' counsel. (Id. ¶ 5). He reviewed a set of records identifying all hours reported and paid by Tech Electric to Plaintiffs during the audit period. (Id. ¶ 5; Ex. A to Grochow Aff. [Doc. No. 82-1.) Plaintiffs' auditor also reviewed the following documents to complete the audit:

a. ADP Payroll Records for the period of January 1, 2012 through September 2013;

b. State Unemployment Quarterly Reports for the period of January 1, 2009 through December 31, 2012; and

c. Tech Electric Service Reports / Field Orders

(Grochow Aff. ¶ 6 [Doc. No. 82].)

101. Plaintiffs' auditor reviewed Tech Electric's quarterly payroll reports and determined that Tech Electric employed a number of electricians who are members of IBEW Local 110. (Id. ¶ 10.) Grochow did not include in the audit the hours recorded for Tech Electric employees who are members of Local 110. (Id.)

102. Grochow was not provided a complete set of the Service Report /Field Orders or time cards or time sheets maintained by Tech Electric. (Id. ¶ 14.) Plaintiffs' auditor received six pages of Service Reports/Field Orders that were produced by Defendant. (Ex. E to Grochow Aff. [Doc. No. 82-5].) These documents – which identify the number of hours specifically worked by an employee, the customer name, job site, and date – are the type of documents that Grochow would typically receive in order to complete an audit. (Grochow Aff. ¶ 14 [Doc. No. 82].)

103. Because Grochow was not provided a complete set of Service Reports/Field Orders, he was unable to reconcile the ADP records with the more specific information that would be found in Service Report/Field Orders or time cards or time sheets. (Id. ¶ 12.) Grochow attests that of the Service Reports/Field Orders that he did obtain, the hours identified per employee did not match the ADP payroll hour information. (Id.) He

28

performed the audit of Defendant's records and created an invoice for hours worked by Local 292 members as reflected on Tech Electric's Minnesota quarterly payroll records.  (Id. ¶¶ 5-6.)  Because a complete set of records identifying the type of work, location of the work, and union membership was not provided by Defendant, Plaintiffs' audit report includes all payroll hours for Local 292 employees of Tech Electric. (Id. ¶¶ 5; 10-12.)  Scott Schmidt, owner of Tech Electric, reviewed the audit invoice with Plaintiffs' auditor and agreed that the ADP payroll and quarterly records would provide the most accurate information regarding employee hours. (Id. ¶ 18).

104.   Schmidt testified that Tech Electric does not maintain time cards.  (Tr.1 at 174 [Doc. No. 67].)  Subsequently, former Tech Electric employee Dale Simon produced Tech Electric time sheets and Service Reports/Field Orders.  (Simon Aff. ¶ 2 [Doc. No. 90].)  Based upon the records provided by Simon, Plaintiffs' auditor attests that it appears that Tech Electric's ADP payroll records and quarterly unemployment reports do not include all hours worked by Tech Electric's employees.  (Second Grochow Aff. ¶¶ 11-12 [Doc. No. 92].)

105.   Although the ADP payroll reports and quarterly reports do not appear to include all hours worked, Plaintiff's auditor and Tech Electric's Scott Schmidt agree that they remain the most accurate source of identification of the minimum number of hours worked by Defendant's employees.  (Grochow Aff. ¶ 18 [Doc. No. 82].)

106.   Based upon Tech Electric's ADP payroll records and quarterly reports from January 2009 through December 2012, Plaintiffs' auditor provided a summary of amounts due, totaling $241,395.91 in contributions, $15,394.73 in interest, and $42,000 in liquidated

damages.   (Ex. H to Grochow Aff. [Doc. No. 82-8]; Grochow Aff. ¶¶ 15-17 [Doc. No. 82].)

 In light of Defendant's termination defense, Plaintiffs' auditor also broke down the total

amount into two separate subtotals: (1) a "Period 1" calculation based on records from March

2009 through April 30, 2010, totaling $13,894.56 in contributions, $1,829.72 in interest, and

$9,000 in liquidated damages; and (2)  a "Period 2" calculation based on records from June

2010 through December 2012, totaling $227,501.35 in contributions, $13,565.01 in interest,

and $42,000 in liquidated damages.  (Id.)

      107.   Grochow's summary in Exhibit H includes an entry for the first quarter of 2010,

for which Grochow indicates $0.00 is owing in contributions, interest, and liquidated

damages.   (Ex. H to Grochow Aff. [Doc. No. 82-8].)   Nor does Grochow list any under-

reported hours or wages for the first quarter of 2010 in the audit invoice.  (Ex. G to Grochow

Aff. at 3 [Doc. No. 82-7].)   Grochow notes that Tech Electric filed fringe fund reports for the

first quarter of 2010.  (See Second Grochow Aff. ¶ 9 [Doc. No. 92]; Ex. J to Grochow Aff.

[Doc. No. 92-1].)   Grochow's working papers reflect amounts identical to those found in

Tech Electric's fringe fund reports/monthly payroll reports for the period of January 2010

through April 2010.  (Cf. Ex. A to Grochow Aff. at 8, 13, 18, 28 [Doc. No. 82-1] with Ex. 1

to Schmidt Aff. [Doc. No. 80].)   The amount of contributions for the period of January 1,

2010 through April 30, 2010 was $7,164.20.  (Id.)  Grochow's working papers note, however,

that while Scott Schmidt did not report any hours or wages for any period of 2010 on Tech

Electric's quarterly tax reports, his name appeared on job tickets during this time.  (Ex. A to

Grochow Aff. at 13 [Doc. No. 82-1].)

108.    Tech Electric calculates damages of $7,164 for the period of January 1, 2010 through April 30, 2010. (Schmidt Aff. ¶ 3 [Doc. No. 80].)  This amount is derived by adding the totals in the fringe fund reports/monthly payroll reports covering this time period.  (Ex. 1 to Schmidt Aff. [Doc. No. 80-1].)  Tech Electric does not dispute this amount.  However, as noted above, according to Plaintiffs' audit, monies Plaintiffs received from Cargill pursuant to a payment arrangement reached by Tech Electric and Plaintiffs prior to the initiation of this lawsuit have satisfied the $7,164 amount.  (Schmidt Aff. ¶ 3 [Doc. No. 80].)

109.    As to any damages covering the period of January 1, 2009 through December 31, 2009, Tech Electric does not submit a rebuttal estimate, contending that the damages that Plaintiffs obtained in the 2008 and 2009 lawsuits satisfy any contributions for this period. (Def.'s Damages Mem.  at 2 [Doc. No. 78].)

110.    One of several employee benefit funds to which Tech Electric had previously contributed was Plaintiff Minneapolis Electrical Industry Board Labor Management Cooperation Committee ("LMCC") Fund – a fund established pursuant to the Inside Agreement. (Grochow Aff. ¶7 [Doc. No. 82].)  An ADP weekly payroll transmittal document prepared for Tech Electric lists an array of  "company options," i.e., various benefits that an employer might offer, including health, annuity, LMCC, JATC, NEBF, pension, 401K, and so forth.  (Ex. B to Grochow Aff. at ADP000005 [Doc. No. 82-2].)  Tech Electric's payroll records indicate that Tech Electric continued calculating the amount due to the LMCC Fund subsequent to dates it claims to have terminated the contract.  (Grochow Aff. ¶¶ 7-8 [Doc. No. 82]; Ex. B to Grochow Aff. [Doc. No. 82-2].)

31

111.   Plaintiffs' auditor determined that after Tech Electric's purported termination, it paid the employees listed on the audit invoice wages consistent with the Local 292 CBA rate. (Grochow Aff. ¶ 9 [Doc. No. 82].)

112.   Jeff Heimerl, Local 292's Business Representative, compared Tech Electric employees listed on Nathan Grochow's audit report with Local 292 membership records. (Heimerl Aff. ¶¶ 4; 6 [Doc. No. 85].)  Heimerl found that each of the following employees, listed on the audit report, were Local 292 members at the time they were working for Tech Electric: Joseph Opat, Scott Schmidt, Dale Simon, Warren Simon, and Paul Snaza.  (Id. ¶ 6.) Both Schmidt and Opat were current in remitting their union dues to Local 292 through the time of trial in June 2013.  (Id.)

## CONCLUSIONS OF LAW

### Liability

1.   Under § 515 of ERISA, employers bound by a CBA must make contributions to the underlying multi-employer plans, consistent with the terms of the applicable controlling CBA. 29 U.S.C. § 1145.   A civil action may be initiated by a fiduciary for or on behalf of a plan to enforce § 515 and to collect damages, including any unpaid contribution, interest, liquidated damages, and attorneys' fees.  See ERISA § 502(a), (g)(2), codified at 29 U.S.C. § 1132(a), (g)(2).

### Liability After April 30, 2010

2.   The Eighth Circuit Court of Appeals has noted that § 515 of ERISA was intended to "simplify actions to collect delinquent contributions, avoid costly litigation, and enhance

the actuarial planning necessary to the administration of multiemployer pension plans." <u>Cent.</u>

<u>States, Se. & Sw. Areas Pension Fund v. Indep. Fruit & Produce Co.</u>, 919 F.2d 1343, 1348

(8th Cir. 1990) (citation omitted). "'[S]ection 515 means that . . . suit [by a trustee] cannot be

thwarted by defenses not apparent from the face of the Agreement.'" <u>Id.</u> at 1349 (quoting

<u>Bituminous Coal Operators' Ass'n, Inc. v. Connors</u>, 867 F.2d 625, 634 (D.C. Cir. 1989)).

"[C]ourts recognize only two defenses to a collection action: that the pension contributions

are themselves illegal or that the collective bargaining agreement is void." <u>Id.</u> (citation

omitted).

 3. Although the Eighth Circuit has not specifically addressed whether the defense

of termination is available in an ERISA §515 action brought by the trustees of fringe benefit

plans, it has held that fringe benefit plans may only seek to collect contributions that an

employer is contractually obligated to pay.  <u>Carpenters Fringe Benefit Funds of Ill. v.</u>

<u>McKenzie Eng'g</u>, 217 F.3d 578, 582 (8th Cir. 2000).  Similarly, other circuits have recognized

that the lack of an existing CBA – including a terminated CBA – is a permitted defense in an

action to enforce rights and recover benefits under the terms of a multi-employer fringe

benefit plan.  <u>See, e.g.</u> <u>Laborers Pension Trust Fund-Detroit & Vicinity v. Interior Exterior</u>

<u>Specialists Constr. Group, Inc.</u>, 394 F. App'x 285 (6th Cir. 2010) (per curiam) (permitting

defendant to establish a termination defense);  <u>La. Bricklayers & Trowel Trades Pension &</u>

<u>Welfare Fund v. Alfred Miller Gen. Masonry Contracting Co.</u>, 157 F.3d 404 (5th Cir.1998)

(noting that courts may consider a termination defense as long as the inquiry is superficial);

<u>see also</u> <u>DeVito v. Hempstead China Shop, Inc.</u>, 38 F.3d 651, 654 (2d Cir.1994) (stating that

employee benefit funds "are not entitled to enforce a nonexistent contractual obligation");

Teamsters Indus. Employees Welfare Fund v. Rolls–Royce Motor Cars, Inc., 989 F.2d 132,

138 (3d Cir.1993) (same).

    4.    In a case in which a termination defense is recognized, the court may perform a

"superficial" or "cursory review" for the purpose of determining whether the contract has

been terminated.  See Interior Exterior Specialists, 394 F. App'x at 290.   The court may

analyze the terms of the contract, but this review must end after a superficial review of the

parties' actions.  Id. "If a superficial inquiry into the record fails to show clear and explicit

termination of the contract, Defendant's termination defense will fail as a matter of law."

Alfred Miller Gen. Masonry, 157 F.3d at 409; see also Interior Exterior Specialists, 394 F.

App'x at 292; Bricklayers Pension Trust Fund-Metro. Area v. Metro Joint Sealants, LLC, No.

08-CV-15200, 2010 WL 3906150, at *11-12 (E. D. Mich. Sept. 28, 2010).

    5.    In response to the parties' cross motions for summary judgment, this Court

previously ruled, consistent with this authority, that the termination defense was available to

Defendant here if it could show that the CBA was terminated based on the plain language of

the agreement and the actions of the parties.  Heimerl v. Tech Electric of Minn., No. 12-CV-

612 (SRN/SER), 2013 WL 1364249, at *6 (D.Minn. April 4, 2013).  The Court found that the

termination defense was consistent with general Eighth Circuit precepts that a limited number

of defenses are available to employers in § 515 actions and that § 515 was meant to simplify

actions to recoup unpaid contributions.  Id.   In addition, the Court noted the parties'

agreement that termination was a defense available to Tech Electric. Id. Ultimately, however,

34

the Court found that material issues of disputed fact remained, noting that the termination

defense required inquiry into both the plain language of the Inside Agreement and the parties'

conduct following a timely attempt to terminate. Id. (citing Interior Exterior Specialists, 394

F. App'x at 292). Thus, in light of disputed issues of material fact, the Court denied the cross

motions for summary judgment and set this matter for trial. Id.

6.   "In interpreting a collective bargaining agreement, . . . [a court] must construe

the contract as a whole," Amcar Div., ACF Indus. Inc. v. NLRB, 641 F.2d 561, 569 (8th

Cir.1981), and read the terms of the agreement "in their context," Mastro Plastics Corp. v.

NLRB, 350 U.S. 270, 281 (1956).   In the context of interpreting the termination provisions

of a CBA, although the Eighth Circuit has not expressly adopted a termination defense, it

appears that the court "favors strict enforcement of the terms of a collective bargaining

agreement where the terms of the agreement make clear the procedures for terminating such

agreement."   See Local 288 Int'l Bhd. of Elec. Workers v. CCT Corp., No. C972036LRR,

2005 WL 1277784, at *14 (N.D. Iowa May 25, 2005) (citing Local 257, Int'l Bhd. of

Electrical Workers v. Grimm, 786 F.2d 342, 346 (8th Cir. 1986) (finding an employer's effort

to terminate a letter of assent was ineffective where it failed to meet the applicable procedural

requirements).   Other courts have adopted this rule of contract interpretation in this ERISA

context.  See Contempo Design, Inc. v. Chi. & Ne. Ill. Dist. Council of Carpenters, 226 F.3d

535, 546 (7th Cir. 2000) (holding termination provision of CBA should be strictly construed

because "the terms of a collective bargaining agreement are to be enforced strictly when the

terms are unambiguous"); see also Trs. of B.A.C. Local 32 Ins. Fund v. Fantin Enters., Inc.,

163 F.3d 965, 969 (6th Cir. 1998); Irwin v. Carpenters Health & Welfare Trust Fund for Cal.,

745 F.2d 553, 556 (9th Cir. 1984).

      7.    Whether a CBA is ambiguous is a question of law.   See Indep. Fruit & Produce,

919 F.2d at 1349.  If a contract is susceptible to more than one reasonable interpretation, it is

ambiguous. Id.  Courts apply federal common law principles of contract interpretation to the

terms of a CBA governed by ERISA.    Reed v. Insituform Techs., Inc., No.12-CV-89

(DWF/LIB), 2014 WL 359333, at *4 (D.Minn. Feb. 3, 2014) (citing Harris v. Epoch Group,

L.C., 357 F.3d 822 (8th Cir. 2004); Cent. States, Se. & Sw. Areas Pension Fund v. Waste

Mgmt. of Mich., Inc., 674 F.3d 630 (7th Cir. 2012)).  Words are given ordinary meaning as

understood by a reasonable, average person.  Id. (citing Indep. Fruit & Produce, 919 F.2d at

1349).   Extrinsic evidence may not be considered in contract interpretation where the

language in question is plain and unambiguous.  Id. (citing Excel Corp. v. United Food &

Commercial Workers Int'l Union, Local 431, 102 F.3d 1464, 1468 (8th Cir.1996)).

      8.    The preliminary question before the Court is whether the termination provisions

of the Letter of Assent and Inside Agreement are unambiguous or ambiguous.  First, the Letter

of Assent incorporates by reference the terms of the Inside Agreement, stating, ". . . [Tech

Electric] agrees to comply with, and be bound by, all of the provisions contained in said

current and subsequent approved labor agreements."  (Pls.' Trial Ex. 1.)  Confusing matters,

however, the Letter of Assent and the Inside Agreement contain two different provisions for

notice of termination. The Letter of Assent requires 150 days' notice to the union and NECA

(Id.), whereas the Inside Agreement requires 90 days' notice, without expressly stating to

whom notice must be given. (<u>Cf.</u> Pls.' Ex. 2, § 1.02(a).)   Moreover, the Inside Agreement also provides that the parties, or an employer, "may" serve "the other" with "a ten (10) day written notice terminating the Agreement" in the event that the parties are unable to resolve their differences after submission of the initial notice.  (<u>Id.</u> at § 1.02(d).)  An Addendum Agreement to the Inside Agreement, applicable only to certain non-Twin Cities counties within the Local 292 jurisdiction, also contains termination provisions, requiring 90 days' termination notice in § 1.02(a), but no additional 10 days' notice is required in § 1.02(d) of the Addendum Agreement.  (<u>Id.</u> at 50.)   The termination provision in the Addendum Agreement also does not expressly indicate to whom notice is to be given.  (<u>Id.</u>)   For all of these reasons, the Court finds that the language found in the controlling provisions of the Letter of Assent and Inside Agreement regarding notice of termination is conflicting, vague, and ambiguous.

9.     Tech Electric's November 25, 2009 notice was sent more than 90 and 150 days before the expiration of the Inside Agreement on April 30, 2010. Given the Inside Agreement's optional language regarding the additional 10-day notice (Pls.' Trial Ex. 2, § 1.02(d)), Tech Electric was not required to provide any such additional notice.

10.     Although the issue of notice is moot because the Court finds that Tech Electric satisfied both the 90-day and 150-day provisions, nonetheless, the Court finds that the Inside Agreement's 90-day provision controls as to litigation between the Plaintiffs, who are third-party beneficiaries to the Inside Agreement, and Tech Electric.  The signatory parties to the Letter of Assent are NECA and Tech Electric.  (<u>See</u> Pls.' Trial Ex. 1.) Plaintiffs are not third-

party beneficiaries, nor are they signatories, to the Letter of Assent. The issue of whether termination of the Letter of Assent was proper is a matter between NECA and Tech Electric. NECA is not a party to this litigation. If NECA believed that Tech Electric had breached the terms of the Letter of Assent, it could have filed suit. While Plaintiffs are neither parties to, nor beneficiaries of the Letter of Assent, they are third-party beneficiaries to the Inside Agreement between NECA and Local 292. See Indep. Fruit & Produce Co.., 919 F.2d at 1348 (stating that a pension fund, while not a party to a CBA, is normally a third-party beneficiary of a pension fund) (citations omitted); see also Sw. Admr's, Inc. v. Rozay's Transfer, 791 F.2d 769, 773 (9th Cir. 1986) (observing, "In an action to recover delinquent contributions, the trust fund stands in the position of a third-party beneficiary of the collective bargaining agreement.") As third-party beneficiaries to the Inside Agreement, Plaintiffs may challenge Defendant's compliance with the termination provisions. Moreover, the rights and obligations that lie at the substantive heart of this case are found in the 78-page Inside Agreement. In contrast, the single-page Letter of Assent merely authorizes NECA to negotiate any current and future CBAs on behalf of Tech Electric. Because the termination provisions of the Inside Agreement are ambiguous, the Court examines the terms of the Inside Agreement and conducts a cursory review of the parties' conduct.

11.     The Inside Agreement's general 90-day termination provision does not expressly state to whom a terminating party must provide notice. (Pls.' Ex. 2, § 1.02(a).) NECA's Minneapolis Chapter Advisor Jeffrey Ohman agreed that § 1.02, which describes how to terminate the Inside Agreement, says nothing about notice to NECA. (Tr.1 at 100

[Doc. No. 67].)  The additional 10-day notice provision in the Inside Agreement, although referring to "either party, or an [e]mployer," provides that the additional termination notice is to be given to "the other" – singular.  (Pls.' Trial Ex. 2 at § 1.02(d)).  The termination letter was copied to NECA; Scott Schmidt testified that he mailed it.  (Pls.' Ex. 7; Tr.1 at 164 [Doc. No. 67].)  In any event, there is no dispute that Local 292 received Tech Electric's notice and that both Local 292 and NECA were aware that Tech Electric sought to terminate.  While NECA claims that it did not receive the November 25, 2009 letter from Tech Electric, NECA was aware of the letter of termination within a few weeks after it was sent – which would fall within the 90-day notice period required by the Inside Agreement.  NECA concedes that the key objective of the Inside Agreement's termination provisions is to ensure that Local 292 and NECA receive notice.  (Tr.1 at 95 [Doc. No. 67].)

12.   In order for a party's termination from a CBA to be effective, the court's cursory inquiry must show that the party "unequivocally" communicated its intent to withdraw from the CBA.  See Interior Exterior Specialists, 394 F. App'x at 290.  Courts have examined the language of a CBA in conjunction with the conduct of the parties in order to determine whether an employer has unequivocally communicated its intention to terminate.  Id. at 291.  This is consistent with the Eighth Circuit's approach in determining whether a labor agreement actually exists, in which "the crucial inquiry is whether there 'is conduct manifesting an intention to abide and be bound by the terms of an agreement.'"  NLRB  v. Int'l Bhd. of Elec. Workers, 748 F.2d 348, 350 (8th Cir. 1984) (quoting Capitol-Husting Co., Inc. v. NLRB, 671 F.2d 237, 243 (7th Cir. 1982)).  The question of whether a party's conduct

manifests an intention to be bound by a CBA is a question of fact, see Bobbie Brooks, Inc. v. Int'l Ladies' Garment Workers Union, 835 F.2d 1164, 1168 (6th Cir. 1987), focusing on the objective intent of the parties.  Mack Trucks, Inc. v. Int'l Union, United Auto, Aerospace & Agric. Implement , 856 F.2d 579, 592 (3d Cir. 1988); see also Bourgeois v Local 112 Insulators & Asbestos Workers, No. 2:09 CV1043, 2011 WL 1831746 at *10 (W.D. La. May 12, 2011).  Subjective evidence of intent may also be relevant in some circumstances, such as "when there are no objective indicia of intent, or the subject matter of the bargain is described in ambiguous terms."  Bourgeois, 2011 WL 1831746 at *10 (citing E. Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l, 861 F.2d 1546, 1551-52 (11th Cir. 1988).

13.    In CBA cases, while "the ultimate inquiry is whether the employer's objective conduct manifests assent to the agreement in light of the provisions of that agreement," courts have examined the following types of conduct as evidence of intent:

> (1) the payment of fringe benefit contributions, (2) the exclusive employment of union members, (3) the payment of union wages, (4) the observation of holidays, (5) use of the Union hiring hall, and (6) the existence of other agreements evidencing assent and the submission of the employer to union jurisdiction, such as those created by allowance or grievance procedures.

Id. (citing Carpenters Amended & Restated Health Benefit Fund v. Holleman Constr. Co. 751 F.2d 763, 771 (5th Cir. 1985); NLRB v. Haberman Constr. Co., 641 F.2d 351, 356 (5th Cir. 1981); Line Constr. Benefit Fund v. Allied Elec. Contractors, Inc., 591 F.3d 576 (7th Cir. 2010)).  One court has observed that the most important of these factors is the continuing payment of fringe benefit contributions.  Id.  As applied to the facts of this case, factors

concerning the continuing payment of fringe benefit contributions, the exclusive employment of union members, and the payment of union wages, are relevant here.

14.     Examining the objective evidence, the Court finds that Tech Electric unequivocally expressed its intent to terminate the Inside Agreement in its letter of November 25, 2009.  (Pls.' Trial Ex. 7.)   Defendant's stated intention to withdraw from the CBA was clear and unconditional:  "It is the intent of Tech Electric to immediately withdraw from any affiliation with IBEW #292."  (Pls.' Trial Ex. 7.)   Although Tech Electric sought to "immediately" terminate its association with the union despite the Inside Agreement's noted expiration date of April 30, 2010, this does not negate Tech Electric's clear expression of intent to terminate the CBA.

15.     In Twin City Pipe Trades Serv. Assoc., Inc. v. Frank O'Laughlin Plumbing & Heating Co., No. 12-CV-1125 (PAM/FLN), 2013 WL 2936360, *1-2 (D. Minn. June 14, 2013), this Court granted summary judgment to a defendant-employer, after considering this same issue.  In Frank O'Laughlin, the employer sent a termination letter on January 27, 2011, "effective January 31, 2011," with respect to a CBA due to expire on April 30, 2011.  Id. Eleven months later, in December 2011, the employer sent another letter expressing its intent to terminate, albeit "effective" on an earlier, different date than in its previous letter – January 1, 2011.  Id. at *1.  The employer conceded its liability to make benefit fund contributions through the expiration date of the CBA, explaining that its reference to an "effective" date referred not to the date of termination, but to the date of giving effective notice.  Id. at *3. Even though the employer had voluntarily continued to contribute to the employee benefit

funds "as a gesture of goodwill," had engaged in negotiations after sending the notice of termination, and had sent the confusing, subsequent termination letter, the Court found that the employer's intent to terminate was nonetheless clear.  Id.  Coupled with the employer's express statement of intent to terminate, the Court noted that the union understood that the letter served as notice of termination.  Id. at *1.  Ultimately, the fact that the employer had made "some missteps" and had "tried to do the right thing" by continuing to make contributions was "not enough to negate its unequivocal termination of the CBA."  Id.  at *3.

16.    The facts here are even stronger than in Frank O'Laughlin.  The November 25, 2009 letter unequivocally expressed Tech Electric's intent to "withdraw from any affiliation with IBEW #292." (Pls.' Trial Ex. 7.)   NECA's Jeffrey Ohman acknowledged that notice of an employer's wish to terminate is the key to the termination requirements of the Inside Agreement. (Id. at 95.)   The December 21, 2009 grievance letter from Local 292's Business Manager to NECA's Chapter Manager objectively confirms that Tech Electric's November 25, 2009 letter served as notice of termination.   While Local 292 took issue with Tech Electric's attempt to "immediately" withdraw from the Inside Agreement, the union recognized that "Tech Electric indicated its intent to prematurely repudiate the Agreement." (Pls.' Trial Ex. 11.)  Local 292 therefore requested "that Tech Electric be ordered to comply with all terms and conditions of the Agreement through April 30, 2010 for all electrical work performed by the employer within the scope of the IBEW's jurisdiction."  (Id.) (emphasis added).  Maghrak testified that Tech Electric was still bound to the Inside Agreement through April 30, 2010, and that Tech Electric might have been obligated to make contributions in the

future by any Inside Agreement that would have been negotiated subsequently. (Tr.1 at 150-51 [Doc. No. 67].)

17.     Unlike the employer in Frank O'Laughlin, Tech Electric ceased making contributions to the multiple types of fringe benefit funds after April 30, 2010 – the lone exception being Tech Electric's continued calculations of the amount due to a single fund, the LMCC Fund. (Grochow Aff. ¶¶ 7-8; Ex. B to Grochow Aff. [Doc. No. 83-2].)  As noted, the continued payment of fringe benefits  may be considered the "most important factor" in the evaluation of an employer's intent to participate in, or assent to, a CBA. Bourgeois, 2011 WL 1831746 at *10.  In addition, after sending the November 25, 2009 termination letter, Tech Electric  – unlike the employer in Frank O'Laughlin – did not attempt to negotiate with Local 292 regarding the Inside Agreement or any terms relative to the continuation of the Inside Agreement. (Tr.1 at 165-66 [Doc. No. 67].)

18.     While Tech Electric continued to employ Local 292 members after April 30, 2010, the Inside Agreement does not preclude a non-signatory employer from doing so.  "In general, only a party to a [CBA] is bound by its terms. . . ." Crest Tankers, Inc. v. Nat'l Maritime Union of Am, 796 F.2d 234, 237 (8th Cir. 1986).  Plaintiff/Trustee Jeff Heimerl testified that non-signatory contractors may perform work in the Local 292 jurisdiction (Tr.1 at 71 [Doc. No. 67]), and Defendant estimates that only 25% of all licensed electricians belong to unions. (Def.'s Letter Brief of 3/21/14 at 2 [Doc. No. 96].)  This conduct is relevant to a determination of whether Tech Electric terminated the Inside Agreement, as the Court noted in its April 4, 2013 Order on Summary Judgment, Heimerl, 2013 WL 1364249 at *7,

however, it is but one factor to be considered.  See Bourgeois, 2011 WL 1831746 at *10.

Another factor is whether the employer exclusively employs members of the union.  Id.  Tech

Electric did not exclusively employ members of Local 292. (See Tr.1 at 205-06 [Doc. No. 67];

Grochow Aff. ¶ 10 [Doc. No. 82].)   In addition, Defendant asserts that it did not actively

solicit Local 292 members, but hired such members when they sought employment from Tech

Electric, absent other union contractor work.  (Def.'s Letter Brief of 3/21/14 at 2 [Doc. No.

96].)  The fact that Tech Electric's owner and some of Tech Electric's employees were union

members  individually  is  likewise  not  dispositive.  Evidence  that  Tech  Electric  union

employees continued to be paid the same rate, post-termination, does not negate the fact of

Tech Electric's termination.   If anything, it shows that Tech Electric valued the work

performed  by  these  employees.    In  short,  none  of  this  conduct  will  "undo  the  valid

termination  that  occurred  many  months  prior"  which  expressly  conveyed  Tech  Electric's

intent to terminate the Inside Agreement.  Frank O'Laughlin, 2013 WL 2936369, at *3.

19.    The objective conduct of Plaintiffs, Local 292 and NECA supports a finding of

termination.   Prior to the initiation of this lawsuit, no one from the Trustees, Local 292 or

NECA, or anyone claiming to represent their interests, had advised Tech Electric that Tech

Electric's termination was ineffective.  Plaintiffs' Plan Administrator Jody Roe-Hardie could

not recall sending delinquency notices to Tech Electric after April 30, 2010. (Tr.1 at 132; 140

[Doc. No. 67].)   After Tech Electric's submission of its November 25, 2009 letter and prior

to the initiation of this lawsuit – some 27 months – Plaintiffs made no demands on Tech

Electric for the filing of fringe fund reports, the payment of contributions, or the initiation of

an audit, nor did Local 292 or NECA make any such demands.  (Tr.2 at 42-43 [Doc. No. 68].)

 Local 292's December 21, 2009 grievance letter made no reference to any follow-up steps

required of Tech Electric in order to effectuate its termination.  (Pls.' Trial Ex. 11; Tr.1 at 157

[Doc. No. 67].)   Nor did anyone from Local 292 communicate with Tech Electric regarding

Tech Electric's purportedly ineffective termination.  (Tr.1 at 154; 210 [Doc. No. 67].)   After

NECA received Tony Maghrak's December 2009 grievance letter, NECA raised no objection

to Local 292's position that Tech Electric be held to the terms of the Inside Agreement through

April 30, 2010.  (Id. at 96.)   Rather, NECA agreed with Local 292 – Jeffrey Ohman's

objection to Defendant's actions was that Tech Electric sought to terminate the Inside

Agreement prematurely.  (Id. at 97-98.)

20.    After Tech Electric did not make a post-expiration payment in mid-May 2010,

Plan Administrator Roe-Hardie referred the matter to Plaintiffs' legal counsel, Ms. Cefalu.

(Id. at 134-38.)   Local 292 had likewise referred Scott Schmidt to Cefalu after Schmidt

contacted the union with questions regarding various legal matters.  (Id. at 173.)  Given the

overlapping membership of the Trustees, Local 292, and NECA (see Tr.1 at 61; 92-95 [Doc.

No. 67]), this is not surprising.   Despite these entangled business relationships, Cefalu

testified that she formed her opinion regarding termination herself, and was not advised by

either Local 292 or NECA.  (Tr.2 at 101-02 [Doc. No. 68].)   In her capacity as legal counsel

for Plaintiffs – the third-party beneficiaries of the Inside Agreement – Cefalu exchanged a

series of emails with Tech Electric's Scott Schmidt.  (Def.'s Trial Exs. 11-13; Pls.' Ex. 16;

Tr.2 at 98 [Doc. No. 68].)   In the emails, which Cefalu described as admittedly "sloppy" (Tr.2

at 101-02), she indicated that Tech Electric had terminated the Inside Agreement.  (Def.'s Trial Exs. 11 & 12; Tr.2 at 98 [Doc. No. 68].)   In one communication, Cefalu asked Schmidt whether Tech Electric had "re-signed" with Local 292, advising Schmidt that if Tech Electric had not renewed its contractual relationship with the union, it would have no liability to make contributions after April 30, 2010.  (Def.'s Trial Ex. 13.)  Schmidt confirmed that he had not re-signed.  (Id.; Tr.2 at 54 [Doc. No. 68].)    Plaintiffs' actions in referring Tech Electric, followed by their legal counsel's opinion that the contract was terminated, strongly suggest that Plaintiffs viewed Tech Electric's termination as effective.

21.    Plaintiffs contend that Tech Electric's failure to expressly notify customers and employees that it was not a Local 292 employer shows that its conduct is inconsistent with termination.   The Inside Agreement places no such additional notification conditions on employers who terminate.   Moreover, the evidence demonstrates that Scott Schmidt did not hold Tech Electric out as a union employer.  Some Tech Electric customers, such as the Lowry Café, viewed Tech Electric as a union employer from past jobs, but there is no evidence that Tech Electric actively deceived customers, or that Defendant's union membership was even a factor in customers' decisions to hire Tech Electric. (Tr.1 at 104-05.) Rather, Tech Electric's union status was of no concern to customers such as Mosaic Crop Nutrition and Cargill, and was therefore never discussed.  (Tr.1 at 180; 186.)   As to its employees, Tech Electric did not hold itself out as a union contractor by its representations or conduct, post-termination.  Local 292 member and Tech Electric employee Dale Simon testified that Schmidt had told him that Tech Electric would not remain with the union once

it had resolved its difficulties concerning delinquent benefits.  (Tr.1 at 202.)   Joseph Opat,

another Tech Electric employee and Local 292 member, was aware that Tech Electric had

ceased paying for health and pension benefits, which it had previously paid. (Tr.1 at 109.)

While summer employee/Local 110 member Chad Johanson believed that Tech Electric was

a Local 292 contractor, his belief apparently stemmed from the knowledge that employees

Opat and Simon were Local 292 members.  (Tr.1 at 205-07.)

22.    While subjective evidence of intent is generally only considered where there is

no objective indicia of intent, see Bourgeois, 2011 WL 1831746, at *10, the Court simply

notes here that the subjective evidence is consistent with a finding of termination, although

the Court does not rely on it in reaching its decision.  Scott Schmidt intended for the

November 25, 2009 letter to terminate the Inside Agreement on behalf of Tech Electric.  (Tr.2

at 39 [Doc. No. 68].)  The only witness to testify regarding whether the notice ineffectively

manifested Tech Electric's intent to withdraw at the time was Plaintiffs' Plan Administrator

Jody Roe-Hardie.  She testified that Local 292 Business Manager Maghrak had informed her

that the termination was ineffective (Tr.1 at 133-34; 137 [Doc. No. 67])), however Maghrak

denies ever making such a statement.  (Id. at 158.)  Maghrak's denial is consistent with Local

292's December 21 grievance letter to NECA in which the union  merely found the effective

date of termination premature, not ineffective. (Pls.' Trial Ex. 11.)    As for NECA,

Minneapolis Chapter Advisor Ohman subjectively believed that Tech Electric's termination

was improper because Tech Electric sought immediate termination – not because Tech

Electric failed to ensure that NECA had received the November 25, 2009 notice  (Id. at 87; 96-99), or because he failed to understand Tech Electric's intent.

23.     For all of the foregoing reasons, the Court finds that the objective evidence of the parties' conduct demonstrates that Tech Electric effectively terminated the Inside Agreement by notifying both Local 292 and NECA of its unequivocal intent to withdraw. See Interior Exterior Specialists, 394 F. App'x at 292.  Accordingly, because Tech Electric terminated the Inside Agreement, effective April 30, 2010, it is liable for any unpaid contributions through that date, as it concedes, but bears no liability from May 1, 2010 to the present.

## Liability from January 1, 2009-December 31, 2009

24.     Defendant argues that Plaintiffs are estopped from obtaining damages for the 2009 period because, in the 2008 and 2009 lawsuits, this Court previously awarded damages to Plaintiffs for that period of time.  (Def.'s Damages Mem. at 3 [Doc. No. 78].)   Plaintiffs contend, however, that collateral estoppel is inapplicable, as this action concerned a request for an audit of Tech Electric's payroll and employment records from January 1, 2009 forward, whereas the previous suits involved Tech Electric's obligation to report fringe benefit contributions, for which Plaintiffs sought judgment using reports submitted by Tech Electric. (Pls.' Damages Mem. at 13-14 [Doc. No. 91].)  Here, however, Plaintiffs contend that they sought to audit Tech Electric's payroll and employment records to determine if any hours were unreported.  (Id. at 15.)  Plaintiffs contend that the audit revealed unreported hours for which they seek damages.

25.    Whether a federal court judgment is preclusive is determined by federal common law.  Taylor v. Sturgell, 553 U.S. 880, 891 (2008) (citation omitted).  The party asserting the defense of collateral estoppel bears the burden of demonstrating that collateral estoppel applies.  In re Miera, 926 F.2d 741, 743 (8th Cir. 1991).  The following four elements must be shown prior to relitigation of a factual issue in a subsequent proceeding:

(1)    the issue sought to be precluded must be the same as that involved in the prior action;
(2)    the issue must have been litigated in the prior action;
(3)    the issue must have been determined by a valid and final judgment; and
(4)    the determination must have been essential to the prior judgment.

Id. (citing Lovell v. Mixon, 719 F.2d 1373, 1376 (8th Cir. 1983)).

26.    The critical factor here is whether the issue in question was determined by a final judgment.  The Court finds that the particular issue in question here was not determined by the earlier judgments.  The audited claims for which Plaintiffs now seek compensation were not included in the fringe benefit reports that Tech Electric submitted in connection with the 2008 and 2009 cases.  Rather, the judgments entered in both of those cases were based on Tech Electric's self-reported contributions.  Plaintiffs' auditor did not include in the audit invoice for this case any hours included in the 2008 and 2009 judgments.  (Ex. G to Grochow Aff. [Doc. No. 82-7]; Second Grochow Aff. ¶ 6 [Doc. No. 92].)  The judgments in the two prior cases do not preclude Plaintiffs from auditing Tech Electric's payroll records for the same period here and obtaining any unpaid contributions discovered during the audit that were not included in the prior judgments.  See Nali v. Maxpro Flooring, LLC, No. 09-CV-3625 (MJD/JJK), 2013 WL 673779, at *4-6 (D. Minn. Feb. 25, 2013) (finding that earlier ERISA

49

judgment based on employer's self-reported contributions did not preclude trustees from recovering, in subsequent litigation, delinquent contributions discovered in an audit for the same time period). Accordingly, Defendant is liable for unpaid contributions over and above the judgments previously paid for the period from January 1, 2009 through December 31, 2009. Consistent with the ruling above concerning damages from January 1, 2010 through April 30, 2010, Plaintiffs may therefore recover any unpaid pre-termination damages for the full period of January 2009 through April 30, 2009.

### **Damages**

27.    ERISA provides that in any action brought by a fiduciary for or on behalf of a plan to enforce an employer to meet its contractual obligations, in which judgment in favor of the plan is awarded, the court shall award

(A) the unpaid contributions,

(B) interest on the unpaid contributions,

(C) an amount equal to the greater of–

(i) interest on the unpaid contributions, or

(ii) liquidated damages provided for under the plan in an amount not in excess of 20 percent (or such higher percentage as may be permitted under Federal or State law) of the amount determined by the court under subparagraph (A),

(D) reasonable attorney's fees and costs of the action, to be paid by the defendant, and

(E) such other legal or equitable relief as the court deems appropriate.

For purposes of this paragraph, interest on unpaid contributions shall be determined by using the rate provided under the plan, or, if none, the rate prescribed under section 6621 of Title 26.

29 U.S.C. § 1132(g)(2).

28.    Plaintiffs submitted the following damages calculations, applicable to the entire damages period:

| | |
|---|---|
| Unpaid contributions: | $241,395.91 |
| Interest at 3% | 15,394.73 |
| Liquidated damages at 5% | 42,000.00 |
| Audit fee | 4,930.12 |
| Total | $303,720.76 |

(Ex. H to Grochow Aff. [Doc. No. 82-8]; Pls.' Damages Mem. at 18 [Doc. No. 91].)   In addition, Plaintiffs provided an alternate damages calculation, in the event that the Court determined that Tech Electric terminated the Inside Agreement effective April 30, 2010:

| | |
|---|---|
| Unpaid contributions: | $13,894.56 |
| Interest at 3% | 1,892.72 |
| Liquidated damages at 5% | 9,000.00 |
| Audit fee | 4,930.12 |
| Total | $29,717.40 |

(Id.)    For the reasons set forth herein, Plaintiffs are entitled to damages for unpaid contributions through April 30, 2010, totaling $13,894.56.

29.    The Inside Agreement does not contain an interest rate in the event of the award of damages.  Plaintiffs' auditor Nathan Grochow attests that he applied an interest rate of 3% – the average rate found in § 6621 of the Internal Revenue Code.  (Grochow Aff. ¶ 17 [Doc. No. 82].)    This interest rate is consistent with 29 U.S.C. § 1132(g)(2).  Accordingly, Plaintiffs' interest calculation of $1,892.72 is approved.

30.     Pursuant to 29 U.S.C. § 1132(g)(2)(C), quoted above, Plaintiffs are additionally entitled to an award that is the greater of an amount equal to the interest on the unpaid contributions or to liquidated damages not to exceed 20% of the amount of unpaid contributions.  As noted, the amount of interest is $1,882.72.  The Inside Agreement provides that contributions received after the last working day of the month in which they are due are subject to a penalty, or liquidated damages, of 5% of the amount due, or $1,000, whichever is greater.  (Pls.' Trial Ex. 2 , § 6.13(c)(2).)  Plaintiff's auditor calculated $9,000 in liquidated damages by applying the CBA's $1,000 per month penalty, as opposed to the 5% calculation, which would be $694.73.  (Id.; Ex. H to Grochow Aff. [Doc. No. 82-8].)  An assessment of $1,000 per month yields the greater of the two calculations.  However, Mr. Grochow's $9,000 calculation comprises 64% of the unpaid contributions of $13,894.56.  Plaintiffs' $9,000 liquidated damages calculation is impermissible, as it exceeds 20% of the unpaid contributions.  29 U.S.C. § 1132(g)(2)(C)(ii).  Subsequently, Plaintiffs submitted a revised liquidated damages calculation of $2,778.91, representing 20% of $13,894.56.  (Pls.' Letter Brief of 3/31/13 at 2 [Doc. No. 100].)  Because 20% of the amount of unpaid contributions is permitted, and because Plaintiffs may receive the greater of the amount of interest on unpaid contributions ($1,892.72) or liquidated damages ($2,778.91), Plaintiffs are entitled to $2,778.91, pursuant to 29 U.S.C. § 1132(g)(2)(C)(i)-(ii).

31.     Although the Inside Agreement does not appear to directly address whether an employer is responsible for assuming the costs of an audit, § 502 of the  ERISA statute permits courts to award any other legal or equitable relief as the court deems appropriate.  29

U.S.C. § 1132(g)(2)(E).  The Court deems it appropriate to award Plaintiffs costs for the portion of the audit attributable to unpaid contributions for the period from January 1, 2009 through April 30, 2010.  Plaintiffs shall submit this calculation with their requests for attorney's fees and costs, as noted below.

32.     Plaintiffs seek an award of attorney's fees and costs to be "established through post-judgment proceedings." (Pls.' Damages Mem. at 18-19 [Doc. No. 91].)  As noted above, ERISA provides for the mandatory award of reasonable attorney's fees and costs to a fiduciary plan that has obtained judgment in an action to recover unpaid employer contributions. See 29 U.S.C. § 1132(g)(2); Laborers Health & Welfare Trust Fund for N. Cal. v. Advanced Lightweight Concrete Co., Inc., 484 U.S. 539, 547 (1988).  However, Plaintiffs have filed no billing records to support their claim for attorney's fees and costs attributable to the claims for which they have obtained judgment, which is limited to the additional amounts owed for the period of January 1, 2009 through April 30, 2010.  Accordingly, the Court is unable to determine the proper amount to award and Defendant is likewise unable to object to the amount billed.  The Court will therefore deny, without prejudice, Plaintiffs' request for an award of attorney's fees and costs.  Plaintiffs may file a separate motion for attorney's fees and costs, with supporting documentation, as to their fees and costs attributable to the period for which they have obtained judgment, i.e., January 1, 2009 through April 30, 2010.  The motion shall be submitted within 30 days of the date of this Order.  Defendant may file an objection, if any, to the amount of attorney's fees and costs requested. Their objection must be filed within 30 days after Plaintiffs' motion is filed.

33.     Defendant also seeks an award of attorney's fees and costs.  (Def.'s Damages Mem. at 9 [Doc. No. 78].)   As to the portion of this ruling that denies any liability of Defendant from May 1, 2010 to the present, for which judgment shall be granted to Defendant, Defendant is not entitled to an award of attorney's fees or costs.  The "'basic point of reference'" on questions of attorney fees is the "American Rule" that "[e]ach litigant pays his own attorney's fees, win or lose, unless a statute or contract provides otherwise."  Hardt v. Reliance Standard Life Ins. Co., 560 U.S. 242, 252-53 (2010).   The ERISA statute provides for the mandatory award of attorney's fees to a prevailing fiduciary plan in an action such as this, and the discretionary award of attorney's fees to an action brought by a prevailing participant, beneficiary, or fiduciary.  29 U.S.C. § 1132(g)(1)(2).  Defendant cites no statutory authority entitling an employer such as Tech Electric to the award of attorney's fees and costs.  The Inside Agreement likewise does not provide for the award of such relief to an employer.  Accordingly, Defendant's request for attorney's fees and costs is denied.

**THEREFORE, IT IS HEREBY ORDERED THAT:**

1.     Based on the Court's Findings of Fact and Conclusions of Law, it is hereby **ORDERED** that judgment be entered in favor of Plaintiffs and against Defendant for the period of January 1, 2009 through April 30, 2010;

2.     Plaintiffs are entitled to a money judgment in the amount of $18,503.19, representing $13,894.56 in fringe benefit contributions, $1,829.72 in interest, and $2,778.91 in liquidated damages for the period of January 1, 2009 through April 30, 2010;

3.      Plaintiffs' request for an award of attorney's fees and costs is **DENIED**

**WITHOUT PREJUDICE**;

4.      It is hereby **ORDERE**D that judgment be entered in favor of Defendant and

against Plaintiffs for the period of May 1, 2010 to the present; and

5.      Defendant's request for an award of attorney's fees and costs is **DENIE**D.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


Dated:    March 31, 2014

                                        s/Susan Richard Nelson
                                        SUSAN RICHARD NELSON
                                        United States District Court Judge